## PRIMROSE *v.* WESTERN UNION TELEGRAPH COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

No. 59. Argued November 1, 2, 1893. — Decided May 26, 1894.

A stipulation between a telegraph company and the sender of a message, that the company shall not be liable for mistakes in the transmission or delivery of a message, beyond the sum received for sending it, unless the sender orders it to be repeated by being telegraphed back to the originating office for comparison, and pays half that sum in addition, is reasonable and valid.

In an action by the sender of a cipher message against a telegraph company, which is not informed, by the message or otherwise, of the nature, importance or extent of the transaction to which it relates, or of the position which the plaintiff would probably occupy if the message were correctly transmitted, the measure of damages for mistakes in its transmission or delivery is the sum paid for sending it.

THIS was an action on the case, brought January 25, 1888, by Frank J. Primrose, a citizen of Pennsylvania, against the Western Union Telegraph Company, a corporation of New York, to recover damages for a negligent mistake of the defendant's agents in transmitting a telegraphic message from

the plaintiff at Philadelphia to his agent at Waukeney in the State of Kansas.

The defendant pleaded: 1st, not guilty; 2d, that the message was an unrepeated message, and was also a cipher and obscure message, and therefore by the contract between the parties under which the message was sent the defendant was not liable for the mistake. At the trial, the following facts were proved and admitted:

On June 16, 1887, the plaintiff wrote and delivered to the defendant at Philadelphia, for transmission to his agent, William B. Toland, at Ellis in the State of Kansas, a message upon one of the defendant's printed blanks, the words printed below in italics being the words written therein by the plaintiff, to wit:

"THE WESTERN UNION TELEGRAPH COMPANY.

"THOS. T. ECKERT, General Manager.　　　NORVIN GREEN, President.

| " Receiver's No. | Time Filed 13 | Check |
|---|---|---|
| | | |

" Send the following message subject to the terms on back hereof, which are hereby agreed to.　　　*June* 16, 1887.

"To *Wm. B. Toland, Ellis, Kansas.*

" *Despot am exceedingly busy bay all kinds quo perhaps bracken half of it mince moment promptly of purchases.*

"*FRANK J. PRIMROSE.*

"☞READ THE NOTICE AND AGREEMENT ON BACK OF THIS BLANK.☜ "

Upon the back of the message was the following printed matter:

"ALL MESSAGES TAKEN BY THIS COMPANY ARE SUBJECT TO THE FOLLOWING TERMS:

" To guard against mistakes or delays, the sender of a message should order it REPEATED; that is, telegraphed back to the originating office for comparison. For this, one half the regular rate is charged in addition. It is agreed between the sender of the following message and this Company, that said Company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery of any UNREPEATED message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery, or for non-delivery of any REPEATED message,

Statement of the Case.

beyond fifty times the sum received for sending the same, unless specially insured; nor in any case for delays arising from unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages. And this company is hereby made the agent of the sender, without liability, to forward any message over the lines of any other company when necessary to reach its destination.

" Correctness in the transmission of a message to any point on the lines of this company can be INSURED by contract in writing, stating agreed amount of risk, and payment of premium thereon, at the following rates, in addition to the usual charge for repeated messages, viz., one per cent for any distance not exceeding 1000 miles, and two per cent for any greater distance. No employé of the company is authorized to vary the foregoing.

" No responsibility regarding messages attaches to this Company until the same are presented and accepted at one of its transmitting offices; and if a message is sent to such office by one of the Company's messengers, he acts for that purpose as the agent of the sender.

" Messages will be delivered free within the established free delivery limits of the terminal office. For delivery at a greater distance, a special charge will be made to cover the cost of such delivery.

" The Company will not be liable for damages or statutory penalties in any case where the claim is not presented in writing within sixty days after the message is filed with the Company for transmission.

" THOS. T. ECKERT, Gen'l Manager.   NORVIN GREEN, President."

On the evening of the same day, an agent of the defendant delivered to Toland, at Waukeney, upon a blank of the defendant company, the message in this form, the written words being printed below in italics:

"THE WESTERN UNION TELEGRAPH COMPANY.

"This Company TRANSMITS and DELIVERS messages only on conditions limiting its liability, which have been assented to by the sender of the following message.

"Errors can be guarded against only by repeating a message back to the sending station for comparison, and the Company will not hold itself liable for errors or delays in transmission or delivery of UNREPEATED MESSAGES, beyond the amount of tolls paid thereon, nor in any case where the claim is not presented in writing within sixty days after sending the message.

"This is an UNREPEATED MESSAGE, and is delivered by request of the sender, under the conditions named above.

"THOS. T. ECKERT, General Manager.         NORVIN GREEN, President.

| NUMBER Rt. | SENT BY S. | REC'D BY F. N. | | CHECK. |
|---|---|---|---|---|
| | | | 22 | Collect 8 extra words. |

" RECEIVED at 5 K. p. m.                    *June* 16, 1887.
" Dated *Philadelphia*, 16.                 *Forwarded from Ellis.*
"To *W. B. Toland, Waukeney, Kansas.*

" *Destroy am exceedingly busy buy all kinds quo perhaps bracken half of it mince moment promptly of purchase.*
                                        "*FRANK J. PRIMROSE.*"

The difference between the message as sent and as delivered is shown below, where so much of the message sent as was omitted in that delivered is in brackets, and the words substituted in the message delivered are in italics.

" [Despot] *Destroy* am exceedingly busy [bay] *buy* all kinds quo perhaps bracken half of it mince moment promptly of purchase[s]."

By the private cipher code made and used by the plaintiff and Toland, the meaning of these words was as follows :

" Yours of the [fifteenth] *seventeenth* received; am exceedingly busy; [I have bought] *buy* all kinds, five hundred thousand pounds; perhaps we have sold half of it; wire when you do anything; send samples immediately, promptly of [purchases] *purchase*."

The plaintiff testified that on June 16, 1887, he wrote the message in his own office on one of a bunch or book of the defendant's blanks which he kept at hand, and sent it to the defendant's office at Philadelphia; that he had a running account with the defendant's agent there, which he settled monthly, amounting to $180 for that month; that he did not then read, and did not remember that he had ever before read, the printed matter on the back of the blanks; and that he paid the usual rate of $1.15 for this message, and did not pay for a repetition or insurance of it.

He also testified that he then was, and for many years had been, engaged in the business of buying and selling wool all over the country, and had employed Toland as his agent in that business, and early in June, 1887, sent him out to Kansas and Colorado with instructions to buy 50,000 pounds, and then to await orders from him before buying more; that, before June 12, Toland bought 50,000 pounds, and then stopped buying; and that he had sent many telegraphic messages to Toland during that month and previously, using the same code.

The defendant's agent at Philadelphia, called as a witness for the plaintiff, testified that he sent this message for the plaintiff, and knew that he was a dealer in wool, and that Toland was with him, but in what capacity he did not know;

that he had frequently sent messages for him, and considered him one of his best customers during the wool season; that telegraphic messages by the present system were sent and received by sound, and were all dots and dashes; that "b" was a dash and three dots, and "y" was two dots, a space and then two dots; and that the difference between "a" and "u" was one dot, "a" being a dot and a dash, and "u" two dots and a dash, and the pause upon the last touch of the "u"; that an experienced telegraph operator, if the words were properly rapped out and he was paying proper attention, could not well mistake the one for the other, but might be misled if he was not careful; and that it was very likely that another dot could be put in if there was any interruption in the wire. He further testified that there was a great difference between the words "despot" and "destroy" in telegraphic symbols; and that the letter "s" was made by three dots, so that, if an operator received the word "purchases" over the wires, and wrote down "purchase," he omitted three dots from the end of the word.

The plaintiff introduced depositions, taken in September, 1888, of one Stevens and one Smith, who were respectively telegraph operators of the defendant at Brookville and at Ellis in the State of Kansas, on June 16, 1887.

Stevens testified that Brookville was a relay station of the company, at which messages from the East were repeated westward; that on that day one Tindall, his fellow operator in the Brookville office, handed him a copy in Tindall's handwriting of the message in question, (an impression copy of which he identified and annexed to his deposition,) containing the words "despot" and "bay," and he immediately transmitted it, word for word to Ellis; that the equipment of the office at Brookville was in every respect good and sufficient, and that he had no recollection of the wires between it and Ellis having been in other than good condition on that day.

Smith testified that on that day he received the message at Ellis from Brookville, and immediately wrote it down word for word, just as received, (and identified and annexed to his deposition an impression copy of what he then wrote down,)

containing the words "destroy" and "buy," and transmitted it, exactly as he received it, to Waukeney, to which Toland had directed any messages for him to be forwarded; and that the office at Ellis was well and sufficiently equipped for its work, but he could not recall what was the condition of the wires between it and Brookville.

The plaintiff also introduced evidence tending to show that June 16, 1887, was a bright and beautiful day at Ellis and Waukeney; that Toland, upon receiving the message at Waukeney, made purchases of about 300,000 pounds of wool; and that the plaintiff, in settling with the sellers thereof, suffered a loss of upwards of $20,000.

The Circuit Court, following *White* v. *Western Union Tel. Co.*, 5 McCrary, 103, and *Jones* v. *Western Union Tel. Co.*, 18 Fed. Rep. 717, ruled that there was no evidence of gross negligence on the part of the defendant, and that, as the message had not been repeated, the plaintiff, by the terms printed upon the back of the message, and referred to above his signature on its face, could not recover more than the sum of $1.15, which he had paid for sending it. The plaintiff not claiming that sum, the court directed a verdict for the defendant, and rendered judgment thereon. The plaintiff tendered a bill of exceptions, and sued out this writ of error.

*Mr. Joseph de F. Junkin,* (with whom was *Mr. George Junkin* on the brief,) for plaintiff in error.

I. A telegraph company is a common carrier, and subject to the law of common carriers. This point has never been squarely before this court; but in *Delaware & Atlantic Tel. Co.* v. *Postal Tel. Co.*, 3 U. S. App. 30, 105, it was said by Butler, J.:

"It is no longer open to question that telephone and telegraph companies are subject to the rules governing common carriers and others engaged in like public employment.

"This has been so frequently decided that the point must be regarded as settled.

"While it has not been directly before the Supreme Court of the United States, cases in which it has been so determined

are cited approvingly by that court in *Budd* v. *New York*, 143 U. S. 517.

· "This case adheres to and confirms the doctrine of *Munn* v. *Illinois*, 94 U. S. 113, which is the leading case on defining the law relating to common carriers."

See also Shearman and Redfield on Negligence, §§ 354, 355, where the position for which we are contending is presented in a manner that seems to us to be unanswerable.

II. Being a common carrier, a telegraph company cannot legally impose conditions upon one whose message it accepts for transmission, relieving itself from responsibility for damages to the sender, resulting from its own negligence.

As was said by the trial judge in this case, the cases in the various state courts where the decisions turned upon this proposition, are very numerous and look both ways.

More or less well considered affirmative discussions of this proposition will be found in the following decisions of the state courts: *Rittenhouse* v. *Independent Telegraph*, 1 Daly, 474, and 44 N. Y. 263; *Turner* v. *Hawkeye Tel. Co.*, 41 Iowa, 458; *Western Union Tel. Co.* v. *Meek*, 49 Indiana, 53; *Western Union Tel. Co.* v. *Fenton*, 52 Indiana, 1; *Tyler* v. *Western Union Tel. Co.*, 60 Illinois, 421, and 74 Illinois, 168; *Ayer* v. *Western Union Tel. Co.*, 79 Maine, 493; *Bartlett* v. *Western Union Tel. Co.*, 62 Maine, 209; *True* v. *International Tel. Co.*, 60 Maine, 9; *Telegraph Co.* v. *Griswold*, 37 Ohio St. 301; *Western Union Tel. Co.* v. *Crall*, 38 Kansas, 679; *Western Union Tel. Co.* v. *Howell*, 38 Kansas, 685; *Dorgan* v. *Telegraph Co.*, 1 Am. Law Times, (N. S.,) 406; *N. Y. &c. Tel. Co.* v. *Dryburgh*, 35 Penn. St. 298; *Hibbard* v. *Western Union Tel. Co.*, 33 Wisconsin, 558; *Candee* v. *Western Union Tel. Co.*, 34 Wisconsin, 471; *La Grange* v. *Southwestern Tel. Co.*, 25 La. Ann. 383. See also Wharton on Negligence, § 763; Shearman and Redfield on Negligence, §§ 558, 559, 565.

In *Ayer* v. *Western Union Tel. Co.*, 79 Maine, 493, 496–498, it is said: "The defendant claims its liability is limited to the amount paid for the transmission of the message. It claims this limitation on two grounds.

"1. The company relies upon a stipulation made by it with

the plaintiff, as follows: ' All messages taken by this company are subject to the following terms: To guard against mistakes or delays, the sender of the message should order it *repeated;* that is, telegraphed back to the originating office for comparison. For this, one-half the regular rate is charged in addition. It is agreed between the sender of the following message and this company, that said company shall not be liable for mistakes or delays in the transmission, or delivery, or for non-delivery of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same.' This is the usual stipulation printed on telegraph blanks, and was known to the plaintiff, and was printed at the top of the paper upon which he wrote and signed his message. He did not ask to have the message repeated.

" Is such a stipulation in the contract of transmission valid as a matter of contract assented to by the parties, or is it void as against public policy? We think it is void.

"Telegraph companies are *quasi* public servants. They receive from the public valuable franchises. They owe the public, care and diligence. Their business intimately concerns the public. Many and various interests are practically dependent upon it. Nearly all interests may be affected by it. Their negligence in it may often work irreparable mischief to individuals and communities. It is essential for the public good, that their duty of using care and diligence be rigidly enforced. They should no more be allowed to effectually stipulate for exemption from this duty, than should a carrier of passengers, or any other party engaged in a public business.

" This rule does not make telegraph companies insurers. It does not make them answer for errors not resulting from their negligence. It only requires the performance of their plain duty. It is no hardship upon them. They engage in the business voluntarily. They have the entire control of their servants and instruments. They invite the public to entrust messages to them for transmission. They may insist on their compensation in advance. Why, then, should they refuse to perform the common duty of care and diligence?

Why should they make conditions for such performance? Having taken the message and the pay, why should they not do all things (including the repeating) necessary for correct transmission? Why should they insist on special compensation for using any particular mode or instrumentality, as a guard against their own negligence? It seems clear to us that, having undertaken the business, they ought, without qualification, to do it carefully, or be responsible for their want of care.

"It is true there are numerous cases in other States holding otherwise, but we think the doctrine above stated is the true one, in harmony with the previous decisions of this court. *True* v. *International Tel. Co.*, 60 Maine, 1; *Bartlett* v. *Western Union Tel. Co.*, 62 Maine, 209."

In *Western Union Tel. Co.* v. *Hall*, 124 U. S. 444, 458, Mr. Justice Matthews, in delivering the opinion of the court, says: "Where the negligence of the telegraph company consists, not in delaying the transmission of the message, but in transmitting a message erroneously so as to mislead the party to whom it is addressed, and on the faith of which he acts in the purchase or sale of property, the actual loss based upon changes in market value are clearly within the value for estimating damages. Of this class examples are to be found in the cases of *Turner* v. *Hawkeye Telegraph Co.*, 41 Iowa, 458, and *Rittenhouse* v. *Independent Line of Telegraph*, 44 N. Y. 263."

In *Dorgan* v. *The Telegraph Co.*, 1 Amer. Law Times, (N. S.,) 406, Mr. Justice Woods said: "The telegraph company is engaged in a quasi public employment. Incalculable sums depend upon the alacrity, care, and good faith which it brings to the discharge of its duties. The whole business of the commercial world is to a degree dependent upon it. The public has a right to exact at least ordinary diligence. A common carrier is not allowed to protect himself by contract from liability for the result of his own negligence.

"There seems to be no good reason why the same rule should not be applied to a telegraph company."

The law as to the liability of common carriers has been so

thoroughly settled by this court that the plaintiff will content himself with simply stating the proposition and the cases supporting the same as follows:

A common carrier cannot stipulate for exemption from the consequences of his own neglect or that of his servants. *Hart* v. *Pennsylvania Railroad*, 112 U. S. 338; *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344; *York Manufacturing Co.* v. *Illinois Central Railroad*, 3 Wall. 107; *Southern Express Co.* v. *Caldwell*, 21 Wall. 264; *Railroad Company* v. *Pratt*, 22 Wall. 123; *Bank of Kentucky* v. *Adams Express*, 93 U. S. 174; *Grand Trunk Railway* v. *Stevens*, 95 U. S. 655.

Apart from all legal views of the subject, every consideration of natural justice revolts at the thought of binding a man by a contract which he has not read or which has not been called to his attention, specifically, and especially, as in this case, when the contract to which he is alleged to have been a party is upon the back of the paper which he signed.

And it is respectfully submitted that the law of this land is, or should be, with reference to these matters, that —

1. Where a telegraph company, vested by the State with the power of eminent domain in consideration of its undertaking a great public franchise, accepts for pay from a citizen a message for transmission, it thereby becomes responsible for the accurate and exact transmission and delivery of that which it received; and if the message which it delivers differs from that which was accepted by it for transmission, and damage results to the sender, the proof by the sender of such error places upon the company the burden of justifying its negligence.

2. That such company cannot shift its responsibility as such common carrier by printing upon its blanks, furnished to the senders of messages, conditions exempting it from liability for errors and mistakes in the transmission of the messages, or for all liability in cipher or obscure messages if it once accepts the messages and receives pay therefor.

3. That such company certainly cannot limit its liability

by such conditions, having once accepted a message for transmission, and received pay therefor, unless it shows affirmative notice of the conditions brought home to the sender.

It is admitted by nearly all of the courts and cases passing upon the subject, that for gross errors the company would undoubtedly be liable; that when a gross error had been committed, even, the restrictive conditions would afford no protection, and the learned judge here impliedly goes that far.

But is there any reason for the drawing of such distinction? What is a gross error in such cases?

The plaintiff in any case against a telegraph company, is entirely without the means of showing how, or why, or when the mistake in a message occurred, excepting as he obtains such information from the company or its employés.

All that he can possibly show is that a mistake has occurred, somewhere and somehow occasioned by something which the defendant had done or omitted to do.

The defendant is bound to provide the best possible apparatus and the most experienced operators for its business. It is a fact of which the courts would now take judicial knowledge, that a telegraph company can transmit with absolute accuracy any written message in any language by sound, each letter being indicated by dots and pauses (or dashes, as they are called) in the working of the telegraph key.

The word as such is not sent over the wire as a whole, but letter by letter. It is not written down by the instrument, but received by the operator by means of the sound and written by him upon paper as he hears it.

These facts are in evidence in this case as well.

There is therefore no reason for any error in the transmission of a message excepting through a mistake made by a negligent operator, or through some outside cause over which the company had no control. The clearness or obscurity of a message has nothing to do with its accurate transmission. It would thus seem clear that the accurate transmission of a cipher message or word is a matter of no more difficulty than an ordinary message, and there can be no valid reason given in support of the arbitrary condition sought to be imposed by

defendant in the matter of such messages, other than what applies to ordinary words.

If a letter in a word is inaccurately transmitted, apart from the question of outside influences, the error must have come about either from a negligent sign by the sending operator, or from a negligent hearing by the receiving operator. And the defendant in error is challenged to assign other causes for the same, if any it can find.

In the present case, it was affirmatively shown that the message reached its last operator but one, with exactness — clearly showing how easy such accuracy was.

Then it suffered these changes. The absence of outside, disturbing agencies, was demonstrated by the plaintiff in so far as he could be expected so to do, when it was shown that the atmospheric conditions at Ellis were perfect.

If any other outside influences affected the wires or the message, they are entirely within the knowledge of the defendants, and may furnish good matter of a defence to the jury.

*Mr. Silas W. Pettitt* and *Mr. John H. Dillon* for defendant in error. *Mr. George H. Fearons* and *Mr. Rush Taggart* were on their brief.

Mr. Justice Gray, after stating the case, delivered the opinion of the court.

This was an action by the sender of a telegraphic message against the telegraph company to recover damages for a mistake in the transmission of the message, which was in cipher, intelligible only to the sender and to his own agent, to whom it was addressed. The plaintiff paid the usual rate for this message, and did not pay for a repetition or insurance of it.

The blank form of message, which the plaintiff filled up and signed, and which was such as he had constantly used, had upon its face, immediately above the place for writing the message, the printed words, " Send the following message

subject to the terms on back hereof, which are hereby agreed to ; " and, just below the place for his signature, this line :    ᴸ " ☞ Read the notice and agreement on back of this blank. ☜ "

Upon the back of the blank were conspicuously printed the words, " All messages taken by this company are subject to the following terms," which contained the following conditions or restrictions of the liability of the company :

" [1st.] To guard against mistakes or delays, the sender of a message should order it REPEATED; that is, telegraphed back to the original office for comparison.  For this, one half the regular rate is charged in addition.  It is agreed between the sender of the following message and this company, that said company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any UNREPEATED message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same ;

" [2d.] nor for mistakes or delays in the transmission or delivery, or for non-delivery, of any REPEATED message, beyond fifty times the sum received for sending the same, unless specially insured ;

" [3d.] nor in any case for delays arising from unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages."

After stating the rates at which correctness in the transmission of a message may be insured, it is provided that " no employé of the company is authorized to vary the foregoing."

" [4th.] The company will not be liable for damages or statutory penalties in any case where the claim is not presented in writing within sixty days after the message is filed with the company for transmission."

The conditions or restrictions, the reasonableness and validity of which are directly involved in this case, are that part of the first, by which the company is not to be liable for mistakes in the transmission or delivery of any message, beyond the sum received for sending it, unless the sender orders it to be repeated by being telegraphed back to the originating office for comparison, and pays half that sum in addition ; and that

part of the third, by which the company is not to be liable at
all for errors in cipher or obscure messages.

Telegraph companies resemble railroad companies and
other common carriers, in that they are instruments of com-
merce ; and in that they exercise a public employment, and
are therefore bound to serve all customers alike, without dis-
crimination.   They have, doubtless, a duty to the public, to
receive, to the extent of their capacity, all messages clearly
and intelligibly written, and to transmit them upon reasonable
terms.   But they are not common carriers ; their duties are
different, and are performed in different ways ; and they are
not subject to the same liabilities.   *Express Co.* v. *Caldwell,*
21 Wall. 264, 269, 270 ; *Telegraph Co.* v. *Texas,* 105 U. S. 460,
464.

The rule of the common law, by which common carriers
of goods are held liable for loss or injury by any cause what-
ever, except the act of God, or of public enemies, does not
extend even to warehousemen or wharfingers, or to any other
class of bailees, except innkeepers, who, like carriers, have
peculiar opportunities for embezzling the goods or for collu-
sion with thieves.   The carrier has the actual and manual
possession of the goods ; the identity of the goods which he
receives with those which he delivers can hardly be mistaken ;
their value can be easily estimated, and may be ascertained
by inquiry of the consignor, and the carrier's compensation
fixed accordingly ; and his liability in damages is measured
by the value of the goods.

But telegraph companies are not bailees, in any sense.
They are entrusted with nothing but an order or message,
which is not to be carried in the form or characters in which
it is received, but is to be translated and transmitted through
different symbols by means of electricity, and is peculiarly
liable to mistakes.   The message cannot be the subject of
embezzlement ; it is of no intrinsic value ; its importance
cannot be estimated, except by the sender, and often cannot
be disclosed by him without danger of defeating his purpose ;
it may be wholly valueless, if not forwarded immediately ;
and the measure of damages, for a failure to transmit or

deliver it, has no relation to any value of the message itself, except as such value may be disclosed by the message, or be agreed between the sender and the company.

As said by Mr. Justice Strong, speaking for this court, in *Express Co.* v. *Caldwell,* above cited: " Like common carriers, they cannot contract with their employers for exemption from liability for the consequences of their own negligence. But they may by such contracts, or by their rules and regulations brought to the knowledge of their employers, limit the measure of their responsibility to a reasonable extent. Whether their rules are reasonable or unreasonable must be determined with reference to public policy, precisely as in the case of a carrier."

By the settled law of this court, common carriers of goods or passengers cannot, by any contract with their customers, wholly exempt themselves from liability for damages caused by the negligence of themselves or their servants. *Railroad Co.* v. *Lockwood,* 17 Wall. 357; *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 442, and cases cited.

But even a common carrier of goods may, by special contract with the owner, restrict the sum for which he may be liable, even in case of a loss by the carrier's negligence; and this upon the distinct ground, as stated by Mr. Justice Blatchford, speaking for the whole court, that " where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations." *Hart* v. *Pennsylvania Railroad,* 112 U. S. 331, 343.

By the regulation now in question, the telegraph company has not undertaken to wholly exempt itself from liability for negligence; but only to require the sender of the message to have it repeated, and to pay half as much again as the usual

price, in order to hold the company liable for mistakes or delays in transmitting or delivering, or for not delivering a message, whether happening by negligence of its servants, or otherwise.

In *Western Union Tel. Co.* v. *Hall*, 124 U. S. 444, 453, the effect of such a regulation was presented by the certificate of the Circuit Court, but was not passed upon by this court, because it was of opinion that upon the facts of the case the damages claimed were too uncertain and remote.

But the reasonableness and validity of such regulations have been upheld in *McAndrew* v. *Electric Tel. Co.*, 17 C. B. 3, and in *Baxter* v. *Dominion Tel. Co.*, 37 Upper Canada Q. B. 470, as well as by the great preponderance of authority in this country. Only a few of the principal cases need be cited.

In the earliest American case, decided by the Court of Appeals of Kentucky, the reasons for upholding the validity of a regulation very like that now in question were thus stated : " The public are admonished by the notice, that in order to guard against mistakes in the transmission of messages, every message of importance ought to be repeated. A person desiring to send a message is thus apprised that there may be a mistake in its transmission, to guard against which it is necessary that it should be repeated. He is also notified that if a mistake occur the company will not be responsible for it unless the message be repeated. There is nothing unreasonable in this condition. It gives the party sending the message the option to send it in such a manner as to hold the company responsible, or to send it for a less price at his own risk. If the message be unimportant, he may be willing to risk it without paying the additional charge. But if it be important and he wishes to have it sent correctly, he ought to be willing to pay the cost of repeating the message. This regulation, considering the accidents to which the business is liable, is obviously just and reasonable. It does not exempt the company from responsibility, but only fixes the price of that responsibility, and allows the person who sends the message either to transmit it at his own risk at the usual price, or by paying in addition thereto half the usual price to have it repeated, and thus render the company

liable for any mistake that may occur." *Camp* v. *Western Union Tel. Co.*, 1 Met. (Ky.) 164, 168.

In *Western Union Tel. Co.* v. *Carew*, 15 Mich. 525, 535, 536, the Supreme Court of Michigan held that a similar regulation was a valid part of the contract between the company and the sender, whether he read it or not. "The regulation," said Chief Justice Christiancy, "of most, if not all telegraph companies operating extensive lines. allowing messages to be sent by single transmission for a lower rate of charge, and requiring a larger compensation when repeated, must be considered as highly reasonable, giving to their customers the option of either mode, according to the importance of the message, or any other circumstance which may affect the question." "The printed blank, before the message was written upon it, was a general proposition to all persons of the terms and conditions upon which messages would be sent. By writing the message under it, signing and delivering it for transmission, the plaintiff below accepted the proposition, and it became a contract upon those terms and conditions."

In *Birney* v. *New York & Washington Tel. Co.*, 18 Maryland, 341, 358, the Court of Appeals of Maryland, while recognizing the validity of similar regulations, held that they did not apply to a case in which no effort was made by the telegraph company or its agents to put the message on its transit.

In *United States Tel. Co.* v. *Gildersleve*, 29 Maryland, 232, 246, 248, the same court, speaking by Mr. Justice Alvey, (since Chief Justice of Maryland, and of the Court of Appeals of the District of Columbia,) said : "The appellant had a clear right to protect itself against extraordinary risk and liability by such rules and regulations as might be required for the purpose." "The appellant could not, by rules and regulations of its own making, protect itself against liability for the consequences of its own wilful misconduct, or gross negligence, or any conduct inconsistent with good faith ; nor has it attempted by its rules and regulations to afford itself such exemption. It was bound to use due diligence, but not to use extraordinary care and precaution. The appellee, by requiring the message to be repeated, could have assured himself of its

dispatch and accurate transmission to the other end of the line, if the wires were in working condition; or, by special contract for insurance, could have secured himself against all consequences of non-delivery. He did not think proper, however, to adopt such precaution, but chose rather to take the risk of the less expensive terms of sending his message. And having refused to pay the extra charge for repetition or insurance, we think he had no right to rely upon the declaration of the appellant's agent that the message had gone through, in order to fix the liability on the company."

In *Passmore* v. *Western Union Tel. Co.*, 9 Phila. 90, and 78 Penn. St. 238, at the trial in the district court of Philadelphia, there was evidence that Passmore, of whom one Edwards had offered to purchase a tract of land in West Virginia, wrote and delivered to the company at Parkersburg, upon a blank containing similar conditions, a message to Edwards at Philadelphia, in these words: "I hold the Tibbs tract for you; all will be right," but which, as delivered by the company in Philadelphia, was altered by substituting the word 'sold' for 'hold;' and that Edwards thereupon broke off the contract for the purchase of the land, and Passmore had to sell it at a great loss. The verdict being for the plaintiff, the court reserved the question whether the defendant was liable, inasmuch as the plaintiff had not insured the message, nor directed it to be repeated; and afterwards entered judgment for the defendant, notwithstanding the verdict, in accordance with an opinion of Judge Hare, the most important parts of which were as follows:

"A railway, telegraph, or other company, charged with a duty which concerns the public interest, cannot screen themselves from liability for negligence; but they may prescribe rules calculated to insure safety; and diminish the loss in the event of accident, and declare that, if these are not observed, the injured party shall be considered as in default, and precluded by the doctrine of contributory negligence. The rule must, however, be such as that reason, which is said to be the life of the law, can approve; or, at the least, such as it need not condemn. By no device can a body corporate avoid lia-

bility for fraud, for wilful wrong, or for the gross negligence which, if it does not intend to occasion injury, is reckless of consequences, and transcends the bounds of right with full knowledge that mischief may ensue. · Nor, as I am inclined to think, will any stipulation against liability be valid, which has the pecuniary interest of the corporation as its sole object, and takes a safeguard from the public without giving anything in return. But a rule — which, in marking out a path plain and easily accessible, as that in which the company guarantees that every one shall be secure, declares that if any man prefers to walk outside of it, they will accompany him, will do their best to secure and protect him, but will not be insurers, will not consent to be responsible for accidents arising from fortuitous and unexpected causes, or even from a want of care and watchfulness on the part of their agents — may be a reasonable rule, and, as such, upheld by the courts."

"The function of the telegraph differs from that of the post-office in this, that while the latter is not concerned with the contents of the missive, and merely agrees to forward it to its address, the former undertakes the much more difficult task of transcribing a message written according to one method of notation, in characters which are entirely different, with all the liability to error necessarily incident to such a process. · Nor is this all. The telegraph operator is separated by a distance of many miles from the paper on which he writes, so that his eye cannot discern and correct the mistakes committed by his hand. It was also contended during the argument, that the electric fluid which is used as the medium of communication is liable to perturbations arising from thunder storms and other natural causes. It is, therefore, obvious that entire accuracy cannot always be obtained by the greatest care; and that the only method of avoiding error is to compare the copy with the original, or, in other words, that the operator to whom the message is sent should telegraph it back to the station whence it came."

"Obviously he who sends a communication is best qualified to judge whether it should be returned for correction. If he asks the company to repeat the message, and they fail to com-

ply, they will clearly be answerable for any injury that may result from the omission. If he does not make such a request, he may well be taken to have acquiesced in the conditions which they prescribe, and at all events cannot object to the want of a precaution he has virtually waived. It is not a just ground of complaint that the power to choose is coupled with an obligation to pay an additional sum to cover the cost of repetition." 9 Phila. 92–94; 78 Penn. St. 242–244.

The judgment was affirmed by the Supreme Court of Pennsylvania, for the reasons given by Judge Hare and above stated. 78 Penn. St. 246; *Western Union Tel. Co.* v. *Stevenson*, 128 Penn. St. 442, 455.

In *Breese* v. *United States Tel. Co.*, 48 N. Y. 132, the plaintiffs' agent wrote, at his own office in Palmyra, on one of the company's blanks, substantially like that now before us, and delivered to the company at Palmyra, a message addressed to brokers in New York, and in these words, "Buy us seven ($700) hundred dollars in gold." In the statement of facts upon which the case was submitted, it was agreed that he had never read the printed part of the blank, and that "the message thus delivered was transmitted from the office at Palmyra, as written; but, by some error of the defendant's operators working between Palmyra and New York," it was received in New York and delivered in this form, "Buy us seven thousand dollars in gold," and the brokers accordingly bought that amount for the plaintiffs, who sold it at a loss. It was held that there was no evidence of negligence on the part of the company, and that, the message not having been repeated, the company was not liable.

In *Kiley* v. *Western Union Tel. Co.*, 109 N. Y. 231, 235–237, a similar decision was made, the court saying: "That a telegraph company has the right to exact such a stipulation from its customers is the settled law in this and most of the other States of the Union and in England. The authorities hold that telegraph companies are not under the obligations of common carriers; that they do not insure the absolute and accurate transmission of messages delivered to them; that

they have the right to make reasonable regulations for the transaction of their business, and to protect themselves against liabilities which they would otherwise incur through the carelessness of their numerous agents, and the mistakes and defaults incident to the transaction of their peculiar business. The stipulation printed in the blank used in this case has frequently been under consideration in the courts, and has always in this State, and generally elsewhere, been upheld as reasonable." "The evidence brings this case within the terms of the stipulation. It is not the case of a message delivered to the operator, and not sent by him from his office. This message was sent, and it may be inferred from the evidence that it went so far as Buffalo, at least; and all that appears further is that it never reached its destination. Why it did not reach there remains unexplained. It was not shown that the failure was due to the wilful misconduct of the defendant, or to its gross negligence. If the plaintiff had requested to have the message repeated back to him, the failure would have been detected and the loss averted. The case is, therefore, brought within the letter and purpose of the stipulation."

In the Supreme Judicial Court of Massachusetts, the reasonableness and validity of such regulations have been repeatedly affirmed. *Ellis* v. *American Tel. Co.*, 13 Allen, 226; *Redpath* v. *Western Union Tel. Co.*, 112 Mass. 71; *Grinnell* v. *Western Union Tel. Co.*, 113 Mass. 299; *Clement* v. *Western Union Tel. Co.*, 137 Mass. 463.

There are cases, indeed, in which such regulations have been considered to be wholly void. It will be sufficient to refer to those specially relied on by the learned counsel for the plaintiff, many of which, however, upon examination, appear to have been influenced by considerations which have no application to the case at bar.

Some of them were actions brought not by the sender, but by the receiver of the message, who had no notice of the printed conditions until after he received it, and could not, therefore, have agreed to them in advance. Such were *New York & Washington Tel. Co.* v. *Dryburg*, 35 Penn. St. 298;

*Harris* v. *Western Union Tel. Co.*, 9 Phila. 88; and *De la Grange* v. *Southwestern Tel. Co.*, 25 La. Ann. 383.

Others were cases of night messages, in which the whole provision as to repeating was omitted, and a sweeping and comprehensive provision substituted, by which, in effect, all liability beyond the price paid was avoided. *True* v. *International Tel. Co.*, 60 Maine, 9, 18; *Bartlett* v. *Western Union Tel. Co.*, 62 Maine, 209, 215; *Candee* v. *Western Union Tel. Co.*, 34 Wisconsin, 471, 476; *Hibbard* v. *Western Union Tel. Co.*, 33 Wisconsin, 558, 564. In *Bartlett's case*, the court said: "Most, if not all, the cases upon this subject refer to rules requiring the repeating of messages to insure accuracy, and seem to be justified in their conclusion on the ground that owing to the liability to error, from causes beyond the skill and care of the operator, it is but a matter of common care and prudence to have the messages repeated; the neglect of which in messages of importance, after being warned of the danger, is a want of care on the part of the sender, and, as the person sending the message is presumed to be the best judge of its importance, he must on his own responsibility make his election whether to have it repeated." 62 Maine, 216, 217.

The passage cited from the opinion of the Circuit Court of Appeals in *Delaware & Atlantic Telephone Co.* v. *Postal Telegraph Co.*, 3 U. S. App. 30, 105, in which the same judge who had decided the present case in the Circuit Court said, "It is no longer open to question that telephone and telegraph companies are subject to the rules governing common carriers and others engaged in like public employment," had regard, as is evident from the context, and from the reference to *Budd* v. *New York*, 143 U. S. 517, to those rules only which require persons or corporations exercising a public employment to serve all alike, without discrimination, and which make them subject to legislative regulation.

In *Rittenhouse* v. *Independent Telegraph*, 1 Daly, 474, and 44 N. Y. 263, and in *Turner* v. *Hawkeye Tel. Co.*, 41 Iowa, 458, it does not appear that the company had undertaken to restrict its liability by express stipulation.

The Indiana decisions cited appear to have been controlled by a statute of the State, enacting that telegraph companies should "be liable for special damages occasioned by failure or negligence of their operators or servants, in receiving, copying, transmitting, or delivering despatches." *Western Union Tel. Co.* v. *Meek,* 49 Indiana, 53; *Western Union Tel. Co.* v. *Fenton,* 52 Indiana, 1.

The only cases, cited by the plaintiff, in which, independently of statute, a stipulation that the sender of a message, if he would hold the company liable in damages beyond the sum paid, must have it repeated and pay half that sum in addition, has been held against public policy and void, appear to be *Tyler* v. *Western Union Tel. Co.,* 60 Illinois, 421, and 74 Illinois, 168; *Ayer* v. *Western Union Tel. Co.,* 79 Maine, 493; *Telegraph Co.* v. *Griswold,* 37 Ohio St. 301; *Western Union Tel. Co.* v. *Crall,* 38 Kansas, 679; *Western Union Tel. Co.* v. *Howell,* 38 Kansas, 685; and a charge to the jury by Mr. Justice Woods, when Circuit Judge, as reported in *Dorgan* v. *Telegraph Co.,* 1 Amer. Law Times, (N. S.) 406, and not included in his own reports.

The fullest statement of reasons, perhaps, on that side of the question, is to be found in *Tyler* v. *Western Union Tel. Co.,* above cited.

In that case, the plaintiffs had written and delivered to the company on one of its blanks, containing the usual stipulation as to repeating, this message, addressed to a broker, " Sell one hundred (100) Western Union; answer price." In the message, as delivered by the company to the broker, the message was changed by substituting " one thousand (1000)." It was assumed that " Western Union " meant shares in the Western Union Telegraph Company. The Supreme Court of Illinois held that the stipulation was " unjust, unconscionable, without consideration, and utterly void." 60 Illinois, 439.

The propositions upon which that decision was based may be sufficiently stated, in the very words of the court, as follows: " Whether the paper presented by the company, on which a message is written and signed by the sender is a contract or not, depends on circumstances," and " whether he

had knowledge of its terms and consented to its restrictions is for the jury to determine as a question of fact upon evidence *aliunde*." "Admitting the paper signed by the plaintiffs was a contract, it did not, and could not, exonerate the company from the use of ordinary care and diligence, both as to their instruments and the care and skill of their operators." "The plaintiffs having proved the inaccuracy of the message, the defendants, to exonerate themselves, should have shown how the mistake occurred;" and, "in the absence of any proof on their part, the jury should be told the presumption was a want of ordinary care on the part of the company." . The printed conditions could not "protect this company from losses and damage occasioned by causes wholly within their own control," but "must be confined to mistakes due to the infirmities of telegraphy, and which are unavoidable." 60 Illinois, 431–433.

The effect of that construction would be either to hold telegraph companies to be subject to the liability of common carriers, which the court admitted in an earlier part of its opinion that they were not; or else to allow to the stipulation no effect whatever, for, if they were not common carriers, they would not, even if there were no express stipulation, be liable for unavoidable mistakes, due to causes over which they had no control.

But the final, and apparently the principal, ground for that decision was restated by the court, when the case came before it a second time, as follows: "On the question whether the regulation requiring messages to be repeated, printed on the blank of the company on which a message is written, is a contract, we held, it was not a contract binding in law, for the reason the law imposed upon the companies duties to be performed to the public, and for the performance of which they were entitled to a compensation fixed by themselves, and which the sender had no choice but to pay, no matter how exorbitant it might be. Among these duties, we held, was that of transmitting messages correctly; that the tariff paid was the consideration for the performance of this duty in each particular case, and when the charges were paid the duty of the

company began, and there was, therefore, no consideration for the supposed contract requiring the sender to repeat the message at an additional cost to him of fifty per cent of the original charges." 74 Illinois, 170, 171.

The fallacy in that reasoning appears to us to be in the assumption that the company, under its admitted power to fix a reasonable rate of compensation, establishes the usual rate as the compensation for the duty of transmitting any message whatever. Whereas, what the company has done is to fix that rate for those messages only which are transmitted at the risk of the sender; and to require payment of the higher rate of half as much again if the company is to be liable for mistakes or delays in the transmission or delivery or in the non-delivery of a message.

Indeed, that learned court frankly admitted that its decision was against the general current of authority, saying: "It must, however, be conceded that there is great harmony in the decisions that these companies can protect themselves from loss, by contract, and that such a regulation as the one under which appellees defended, is a reasonable regulation and amounts to a contract." And again: "We are not satisfied with the grounds on which a majority of the decisions of respectable courts are placed." 60 Illinois, 430, 431, 435.

In the case at bar, the message, as appeared by the plaintiff's own testimony, was written by him at his office in Philadelphia, upon one of a bunch of the defendant's blanks, which he kept there for the purpose. Although he testified that he did not remember to have read the printed matter on the back he did not venture to say that he had not read it; still less, that he had not read the brief and clear notices thereof upon the face of the message, both above the place for writing the message, and below his signature. There can be no doubt, therefore, that the terms on the back of the message, so far as they were not inconsistent with law, formed part of the contract between him and the company under which the message was transmitted.

The message was addressed by the plaintiff to his own agent in Kansas, was written in a cipher understood by them

only, and was in these words : " Despot am exceedingly busy bay all kinds quo perhaps bracken half of it mince moment promptly of purchases." As delivered by the company to the plaintiff's agent in Kansas, it had the words " destroy " instead of " despot," " buy " instead of " bay," and " purchase " instead of " purchases."

The message having been sent and received on June 16, the mistake, in the first word, of " despot " for " destroy," by which, for a word signifying, to those understanding the cipher, that the sender of the message had received from the person to whom it was addressed his message of June 15, there was substituted a word signifying that his message of June 17 had been received, (which was evidently impossible,) could have had no other effect than to put him on his guard as to the accuracy of the message delivered to him.

The mistake of substituting, for the last word " purchase " in the singular, the word " purchases " in the plural, would seem to have been equally unimportant, and is not suggested to have done any harm.

The remaining mistake, which is relied on as the cause of the injury for which the plaintiff seeks to recover damages in this action, consisted in the change of a single letter, by substituting " u " for " a," so as to put " buy " in the place of " bay." By the cipher code, " buy " had its common meaning, though the message contained nothing to suggest to any one, except the sender or his agent, what the latter was to buy; and the word " bay," according to that code, had (what no one without its assistance could have conjectured) the meaning of " I have bought."

The impression copies of the papers kept at the defendant's offices at Brookville and Ellis, in the State of Kansas, (which were annexed to the depositions of operators at those offices, and given in evidence by the plaintiff at the trial,) prove that the message was duly transmitted over the greater part of its route, and as far as Brookville; for they put it beyond doubt that the message, as received and written down by one of the operators at Brookville, was in its original form; and that, as written down by the operator at Ellis, it was in its altered

form. While the testimony of the deponents is conflicting, there is nothing in it to create a suspicion that either of them did not intend to tell the truth. Nor is there anything in the case, tending to show that there was any defect in the defendant's instruments or equipment, or that any of its operators were incompetent persons.

If the change of words in the message was owing to mistake or inattention of any of the defendant's servants, it would seem that it must have consisted either in a want of plainness of the handwriting of Tindall, the operator who took it down at Brookville, or in a mistake of his fellow operator, Stevens, in reading that writing, or in transmitting it to Ellis; or else in a mistake of the operator at Ellis, in taking down the message at that place. If the message had been repeated, the mistake, from whatever cause it arose, must have been detected by means of the differing versions made and kept at the offices at Ellis and Brookville.

As has been seen, the only mistake of any consequence in the transmission of the message consisted in the change of the word "bay" into "buy," or rather of the letter "a" into "u." In ordinary handwriting, the likeness between these two letters, and the likelihood of mistaking the one for the other, especially when neither the word nor the context has any meaning to the reader, are familiar to all; and in telegraphic symbols, according to the testimony of the only witness upon the subject, the difference between these two letters is a single dot.

The conclusion is irresistible, that if there was negligence on the part of any of the defendant's servants, a jury would not have been warranted in finding that it was more than ordinary negligence; and that, upon principle and authority, the mistake was one for which the plaintiff, not having had the message repeated according to the terms printed upon the back thereof, and forming part of his contract with the company, could not recover more than the sum which he had paid for sending the single message.

Any other conclusion would restrict the right of telegraph companies to regulate the amount of their liability within

narrower limits than were allowed to common carriers in *Hart* v. *Pennsylvania Railroad*, already cited, in which five horses were delivered by the plaintiff to a railroad company for transportation under a bill of lading, signed by him and by its agent, which stated that the horses were to be transported upon the terms and conditions thereof, " admitted and accepted by " the plaintiff " as just and reasonable," and that freight was to be paid at a rate specified, on condition that' the carrier assumed a liability not exceeding two hundred dollars on each horse ; and the Circuit Court, and this court, on writ of error, held that the contract between the parties could not be controlled by evidence that one of the horses was killed by the negligence of the railroad company, and was a race horse, worth fifteen thousand dollars.   2 McCrary, 333 ; 112 U. S. 331.

It is also to be remembered that, by the third condition or restriction in the printed terms forming part of the contract between these parties, it is stipulated that the company shall not be " liable in any case " " for errors in cipher or obscure messages ; " and that it is further stipulated that " no employé of the company is authorized to vary the foregoing," which evidently includes this, as well as other restrictions.

It is difficult to see anything unreasonable, or against public policy, in a stipulation that if the handwriting of a message, delivered to the company for transmission, is obscure, so as to be read with difficulty, or is in cipher, so that the reader has not the usual assistance of the context in ascertaining particular words, the company will not be responsible for its miscarriage, and that none of its agents shall, by attempting to transmit such a message, make the company responsible.

As the message was taken down by the telegraph operator at Brookville in the same words in which it was delivered by the plaintiff to the company at Philadelphia, it is evident that no obscurity in the message, as originally written by the plaintiff, had anything to do with its failure to reach its ultimate destination in the same form.

But it certainly was a cipher message ; and to hold that the acceptance by the defendant's operator at Philadelphia made the company liable for errors in its transmission would not only disregard the express stipulation that no employé of the company could vary the conditions of the contract, but would wholly nullify the condition as to cipher messages, for the fact that any message is written in cipher must be apparent to every reader.

Beyond this, under any contract to transmit a message by telegraph, as under any other contract, the damages for a breach must be limited to those which may be fairly considered as arising according to the usual course of things from the breach of the very contract in question, or which both parties must reasonably have understood and contemplated, when making the contract, as likely to result from its breach. This was directly adjudged in *Western Union Tel. Co.* v. *Hall*, 124 U. S. 444.

In *Hadley* v. *Baxendale*, 9 Exch. 345, decided in 1854, ever since considered a leading case on both sides of the Atlantic, and approved and followed by this court in *Western Union Tel. Co.* v. *Hall*, above cited, and in *Howard* v. *Stillwell Co.*, 139 U. S. 199, 206, 207, Baron Alderson laid down, as the principles by which the jury ought to be guided in estimating the damages arising out of any breach of contract, the following : " Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i.e.* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a

breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract." 9 Exch. 354, 355.

In *Sanders* v. *Stuart,* which was an action by commission merchants against a person whose business it was to collect and transmit telegraph messages, for neglect to transmit a message in words by themselves wholly unintelligible, but which could be understood by the plaintiffs' correspondent in New York as giving a large order for goods, whereby the plaintiffs lost profits, which they would otherwise have made by the transaction, to the amount of £150, Lord Chief Justice Coleridge, speaking for himself and Lords Justices Brett and Lindley, said : "Upon the facts of this case we think that the rule in *Hadley* v. *Baxendale* applies, and that the damages recoverable are nominal only. It is not necessary to decide, and we do not give any opinion how the case might be, if the message, instead of being in language utterly unintelligible, had been conveyed in plain and intelligible words. It was conveyed in terms which, as far as the defendant was concerned, were simple nonsense. For this reason, the second portion of Baron Alderson's rule clearly applies. No such damages as above mentioned could be 'reasonably supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it;' for the simple reason that the defendant, at least, did not know what his contract was about, nor what, nor whether any, damage would follow from the breach of it. And for the same reason, viz., the total ignorance of the defendant as to the subject-matter of the contract, (an ignorance known to, and, indeed, intentionally procured by the plaintiffs,) the first portion of the rule applies also; for there are no damages more than nominal which can 'fairly and reasonably be considered as arising naturally, *i.e.* according

to the usual course of things, from the breach' of such a contract as this." 1 C. P. D. 326, 328; 45 Law Journal, (N. S.,) C. P. 682, 684.

In *United States Tel. Co.* v. *Gildersleve*, already referred to, which was an action by the sender against a telegraph company for not delivering this message received by it in Baltimore, addressed to brokers in New York, "Sell fifty (50) gold," Mr. Justice Alvey, speaking for the Court of Appeals of Maryland, and applying the rule of *Hadley* v. *Baxendale*, above cited, said : " While it was proved that the dispatch in question would be understood among brokers to mean fifty thousand dollars of gold, it was not shown, nor was it put to the jury to find, that the appellant's agents so understood it, or whether they understood it at all. ' Sell fifty gold ' may have been understood in its literal import, if it can be properly said to have any, or was as likely to be taken to mean fifty dollars, as fifty thousand dollars, by those not initiated. And if the measure of responsibility at all depends upon a knowledge of the special circumstances of the case, it would certainly follow that the nature of this dispatch should have been communicated to the agent at the time it was offered to be sent, in order that the appellant might have observed the precautions necessary to guard itself against the risk. But without reference to the fact as to whether the appellant had knowledge of the true meaning and character of the dispatch, and was thus enabled to contemplate the consequences of a breach of the contract, the jury were instructed that the appellee was entitled to recover to the full extent of his loss by the decline in gold. In thus instructing the jury, we think the court committed error, and that its ruling should be reversed." 29 Maryland, 232, 251.

In *Baldwin* v. *United States Tel. Co.*, which was an action by the senders against the telegraph company, for not delivering this message, " Telegraph me at Rochester what that well is doing," Mr. Justice Allen, speaking for the court of Appeals of New York, said : " The message did not import that a sale of any property, or any business transaction, hinged upon the prompt delivery of it, or upon any answer that might be

received. For all the purposes for which the plaintiffs desired the information, the message might as well have been in a cipher, or in an unknown tongue. It indicated nothing to put the defendant upon the alert, or from which it could be inferred that any special or peculiar loss would ensue from a non-delivery of it. Whenever special or extraordinary damages, such as would not naturally or ordinarily follow a breach, have been awarded for the non-performance of contracts, whether for the sale or carriage of goods, or for the delivery of messages by telegraph, it has been for the reason that the contracts have been made with reference to peculiar circumstances known to both, and the particular loss has been in the contemplation of both, at the time of making the contract, as a contingency that might follow the non-performance." " The dispatch not indicating any purpose, other than that of obtaining such information as an owner of property might desire to have at all times and without reference to a sale, or even a stranger might ask for purposes entirely foreign to the property itself, it is very evident that, whatever may have been the special purpose of the plaintiffs, the defendant had no knowledge or means of knowledge of it, and could not have contemplated either a loss of a sale, or a sale at an under value, or any other disposition of or dealing with the well or any other property, as the probable or possible result of a breach of its contract. The loss which would, naturally and necessarily, result from the failure to deliver the message, would be the money paid for its transmission, and no other damages can be claimed upon the evidence as resulting from the alleged breach of duty by the defendant." 45 N. Y. 744, 749, 750, 752. See also *Hart* v. *Direct Cable Co.*, 86 N. Y. 633.

The Supreme Court of Illinois, in *Tyler* v. *Western Union Tel. Co.*, above cited, took notice of the fact that in that case " the dispatch disclosed the nature of the business as fully as the case demanded." 60 Illinois, 434. And in the recent case of *Postal Tel. Co.* v. *Lathrop*, the same court said : " It is clear enough that, applying the rule in *Hadley* v. *Baxendale*, *supra*, a recovery cannot be had for a failure to correctly

transmit a mere cipher dispatch unexplained, for the reason that to one unacquainted with the meaning of the ciphers it is wholly unintelligible and nonsensical.   An operator would, therefore, be justifiable in saying that it can contain no information of value as pertaining to a business transaction; and a failure to send it, or a mistake in its transmission, can reasonably result in no pecuniary loss."   131 Illinois, 575, 585.

The same rule of damages has been applied, upon failure of a telegraph company to transmit or deliver a cipher message, in one of the Wisconsin cases cited by the plaintiff, and in many cases in other courts.   *Candee* v. *Western Union Tel. Co.*, 34 Wisconsin, 471, 479–481; *Beaupré* v. *Pacific & Atlantic Tel. Co.*, 21 Minnesota, 155; *Mackay* v. *Western Union Tel. Co.*, 16 Nevada, 222; *Daniel* v. *Western Union Tel. Co.*, 61 Texas, 452; *Cannon* v. *Western Union Tel. Co.*, 100 No. Car. 300; *Western Union Tel. Co.* v. *Wilson*, 32 Florida, 527; *Behm* v. *Western Union Tel. Co.*, 8 Bissell, 131; *Western Union Tel. Co.* v. *Martin*, 9 Bradwell, 587; *Abeles* v. *Western Union Tel. Co.*, 37 Missouri App. 554; *Kinghorne* v. *Montreal Tel. Co.*, 18 Upper Canada Q. B. 60, 69.

In the present case, the message was, and was evidently intended to be, wholly unintelligible to the telegraph company or its agents.   They were not informed, by the message or otherwise, of the nature, importance or extent of the transaction to which it related, or of the position which the plaintiff would probably occupy if the message were correctly transmitted.   Mere knowledge that the plaintiff was a wool merchant, and that Toland was in his employ, had no tendency to show what the message was about.   According to any understanding which the telegraph company and its agents had, or which the plaintiff could possibly have supposed that they had, of the contract between these parties, the damages which the plaintiff seeks to recover in this action, for losses upon wool purchased by Toland, were not such as could reasonably be considered, either as arising, according to the usual course of things, from the supposed breach of the contract itself, or as having been in the contemplation of both parties,

when they made the contract, as a probable result of a breach of it.

In any view of the case, therefore, it was rightly ruled by the Circuit Court that the plaintiff could recover in this action no more than the sum which he had paid for sending the message.

*Judgment affirmed.*

MR. CHIEF JUSTICE FULLER and MR. JUSTICE HARLAN dissented.

MR. JUSTICE WHITE, not having been a member of the court when this case was argued, took no part in its decision.