LEAR, Judge.
Petitioner alleges the erroneous transmission and delivery of a telegram addressed by petitioner to Defense General Supply Center, Richmond, Virginia, which caused petitioner to lose a contract for the sale of certain Osnaburg Sand Bags and a profit of $25,000.00.
Defendant admitted that on July 21, 1965, plaintiff presented to it a message typed by plaintiff on a Western Union Telegraph Company standard message contract form, addressed to the Defense General Supply Center, as follows:
“3000 PG 60 DAYS AFTER AWARD-6000 PG 90 DAYS AFTER AWARD-6000 PG 120 DAYS AFTER AWARD-6000 PG 150 DAYS AFTER AWARD-6000 PG 180 DAYS AFTER AWARD. DELIVERED TRACY, CALIFORNIA. PRICE $20.77 PER PG. DISCOUNT -i/g of 1% — 20 DAYS. SIGNED: CROWLEY INDUSTRIAL BAG COMPANY, INC., CROWLEY, LOUISIANA.”
The answer further admitted that the defendant omitted the transmission of the bid on 6000 PG 120 DAYS AFTER AWARD and 6000 PG 150 DAYS AFTER AWARD.
In further answer to the demand, defendant alleges that the message was delivered to and accepted by it subject to the terms of its standard message contract, which it claims provides that defendant shall not be liable for mistakes in the transmission or delivery or any message received at the unrepeated message rate beyond the sum of $500.00. It goes on to allege that the message was in interstate commerce and was received by defendant for transmission at its unrepeated message rate. It then shows that its message contract was on file with the Federal Communications . Commission as part of its tariff.
Defendant then asked for judgment in its favor, but further asked that if liability is established, then the amount of the award to plaintiff should not exceed $500.00.
On the trial of the case, it was shown without contradiction that the actual loss to plaintiff by the erroneous transmission was the sum of $20,052.00. There was also received in evidence a certified copy of the defendant’s tariff on file with the Federal Communications Commission. The tariff provides as follows :
“To guard against mistakes or delays, the sender of a message should order it repeated, that is, telegraphed back to the originating office for comparison. For this, one-half the unrepeated message rate is charged in addition. Unless otherwise indicated on its face, this is an unre *727 peated message and paid for as such, in consideration whereof it is agreed between the sender of the message and the Telegraph Company as follows:
“1. The Telegraph Company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any message received for transmission at the unrepeated-message rate beyond the sum of five hundred dollars; nor for mistakes or delays in the transmission or delivery, or for non-delivery, of any message received for transmission at the repeated-message rate beyond the sum of five thousand dollars, unless specially valued; nor in any case for delays arising from unavoidable interruption in the working of its lines.”
The above quoted language of the tariff is printed on the reverse side of the telegram blanks furnished by Western Union to its customers for the writing of the message desired to be sent. Such a blank was used by petitioner in the instant case, and it is to be noted that on the front of the message blank there is printed the following clause :
“Send the following message, subject to the terms on back hereof, which are hereby agreed to”.
The trial court gave judgment for the plaintiff in the sum of $20,052.00 and defendant perfected an appeal to this court.
Mr. H. J. Scholl, president of the Crowley Industrial Bag Company, testified that he initiated the message in question, that he directed that it be sent by the defendant, and that he had never heard of “a repeat rate as a form of telegramming”.
Mr. Charles Miller was the Western Union operator who transmitted the message and who testified that he had never called it to anyone’s attention that the reverse of the telegram blank contained a limitation of liability provision. Therefore, we think it can be taken as established that petitioner had no actual knowledge of the wording of the printed matter on the reverse side of the blank used to type in the original message for transmission over the telegraphic lines of defendant. This finding of fact is mentioned because plaintiff makes much of its lack of knowledge in brief filed before this court.
The trial court, in its written reasons for judgment, states that it is not the intent of the law to allow defendant to set aside a ‘moral obligation’ to properly transmit messages and in justification for the decision in favor of plaintiff and the award of all damages shown, cites La.R.S. 45:785, which provides that persons operating telegraph or telephone lines or systems and doing business in the State of Louisiana are required to pay for all damages that may arise from the failure, refusal or neglect to transmit or to deliver or from any delay in the transmission or delivery or from any error made in the transmission or the delivery of any message offered them for transmission.
Unfortunately for plaintiff’s position, neither the actual notice of the limitation of liability, or the lack thereof, nor the moral obligation incumbent upon defendant to properly transmit messages authorizes our courts to award petitioner more than $500.00 in damages.
Prior to 1910, telegraph companies attempted to limit their liability for errors and mistakes in transmission and delivery by having provisions printed on the blanks furnished for messages to the effect that unless the message was repeated (for which an additional charge was made), the telegraph company would not be liable beyond a return to the sender of the cost of transmission. Some states upheld as valid that type of provision, whereas others struck them down as being opposed to public policy and hence void. Some states made a distinction between ordinary negligence and gross negligence or willful default, ajlow-ing a limitation of liability for the former but denying it in case of the latter. Some jurisdictions made a distinction between errors which would not have been prevented by repetition of the message, and in such cases allowed recovery of actual damages regardless of the presence of a limitation *728 stipulation. The United States Supreme Court stated that as a matter of general common law, telegraph companies were prohibited on grounds of public policy from contracting for exemption from all liability for negligence but were permitted to limit the measure of their liability to a reasonable extent by a special contract, adding that a stipulation limiting liability for mistakes in the transmission of unrepeated messages would be a reasonable limitation. See Primrose v. Western Union Telegraph Co., 154 U.S. 1, 14 S.Ct. 1098, 38 L.Ed. 883 (1894).
In 1910, the Interstate Commerce Act of 1887 was extended to include telegraph companies. As amended by Act of February 28, 1920, ch. 91, 41 Stat. 474, 49 U.S.C. Section 1(5), it was provided:
“ * * * That messages by wire or wireless subject to the provisions of this Act may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages: * * * ”
Postal Telegraph-Cable Co. v. Warren-Godwin Lumber Co., 251 U.S. 27, 40 S.Ct. 69, 64 L.Ed. 118 (1919), definitely settled that the Act of 1910, as amended by the Act of 1920, preempted to Congress the exclusive jurisdiction and control of interstate telegraph messages and sanctioned, subject to the approval of the Interstate Commerce Commission, reasonable limitations on the liability of a telegraph company for errors and mistakes in the transmission of messages, based on the various classifications.
By order effective July 13, 1921, the Interstate Commerce Commission established fixed limitations of liability for interstate wire and wireless messages in substantial sums, namely $500.00 for unrepeated, and $5,000.00 for repeated messages, and when the regulation of wire and wireless transmission service was transferred to the Federal Communications Commission, established by the Communications Act of 1934, this order was continued in effect.
Mr. Justice Brandeis, in Western Union Telegraph Co. v. Esteve Bros. & Co., 256 U.S. 566, 41 S.Ct. 584, 65 L.Ed. 1094 (1921), answered for us all of the questions presented by this case. He there said:
“The Act of 1910 introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the Act the companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect”.
Estherwood Rice Mill, Inc. v. Western Union Telegraph Co., La.App., 127 So.2d 231 (3rd Cir.), cited by the trial judge, gives us no help. In that case, the court was clearly dealing with a repeated message, rather than unrepeated, and the award therein was within the $5,000.00 limitation provided for messages of that character.
For the reasons above given, the judgment of the lower court is affirmed, but amended to award plaintiff only the sum of $500.00, which is the limit of defendant’s liability under its contract to transmit the message submitted to it by plaintiff.
Amended, and as so amended, affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.