JELSKE CRAMER, Appellee, v. CHICAGO, ROCK ISLAND &
PACIFIC RAILROAD COMPANY, Appellant.

**Carriers:** LIMITATION OF LIABILITY BY CONTRACT: FEDERAL STATUTES:
1 POWER OF STATE. The statute of this state which declares invalid
any contract with a railway company whereby an attempt, by
means of an agreed valuation of property shipped, is made to
limit the liability of the company for negligent transportation,
is not superseded by the Acts of Congress relating to interstate
commerce; as the statute was in force and had been held valid
prior to the action of Congress; and the state is not deprived
thereby of its right to enact such a statute by virtue of its police
power.

**Same:** FILING OF RATES WITH INTERSTATE COMMERCE COMMISSION: EF-
2 FECT. The filing with the Interstate Commerce Commission of a
schedule of rates raises no presumption that the commission
agreed to such rates, or to the proposed conditions of shipment,
and thus gave its sanction to the class of contracts prohibited
by our statute, so that it may be said the power of the state
has been superseded by Federal action; especially in view of the
Federal statute providing that an initial carrier shall be liable
for the negligence of any connecting carrier, notwithstanding any
contract or regulation to the contrary.

**Same:** INTERSTATE SHIPMENTS: CONTRACT: LIABILITY: INVALIDITY:
3 EFFECT. The determination that a contract for an interstate ship-
ment of property, providing that in case of loss the shipper can

only recover the agreed value, is invalid, does not operate to give the shipper a rebate, even though a lower rate was charged because of low valuation, but simply affords him an opportunity to recover his actual loss.

**Same.** Filing a schedule of transportation rates with the Interstate Commerce Commission, at a time when the Commission had no power to fix rates, in which one rate was made to shippers in consideration for a stipulated recovery value in case of loss, and another rate where no such stipulation was made, does not determine the validity of the contract but leaves the question to the state courts; and a determination by a state court that the contract is invalid does not result in giving to a shipper by that method a less rate than that required by law.

*Appeal from Wright District Court.*—HON. CHAS. E. ALBROOK, Judge.

MONDAY, NOVEMBER 20, 1911.

ACTION at law to recover for damages done to a shipment of hogs over defendant's road from Galt, Iowa, to Chicago, Ill. Many defenses were interposed, to some of which plaintiff demurred. This demurrer was sustained in part and overruled in part, and the case was tried, resulting in a judgment for plaintiff in the sum of $828. Defendant appeals.—*Affirmed.*

*Carroll Wright, J. L. Parrish* and *Ladd & Rogers,* for appellant.

*Nagle & Nagle,* for appellee.

DEEMER, J.—The appeal presents but a single question. Defendant pleaded as a partial defense certain stipulations in the bill of lading issued to plaintiff for the car of hogs, reading as follows:

Eighth. That in case of total loss of any of the live stock covered by this contract from any cause for which

the first party may be liable, payment will be made therefor on the basis of the actual cash value at the time and place of shipment, but in no case to exceed $100.00 for each horse, pony, gelding, mare or stallion, mule or jack; $50.00 for each ox, bull or steer; $30.00 for each cow; $10.00 for each calf or hog; $3.00 for each sheep or goat, and in case of injury or partial loss, the amount of damage claimed shall not exceed the same proportion.

Fourteenth. That no person, other than the owner of the stock shipped, or his duly authorized agent, in the name of the owner, shall be allowed to sign this contract.

Seventeenth. That in making this contract the undersigned owner, or other agent of the owner, of the stock named herein expressly acknowledges that he has had the option of making this shipment under the tariff rates either at carrier's risk or upon a limited liability and that he has selected the rate and liability named herein, and expressly accepts and agrees to all the stipulations and conditions herein named.

Nineteenth. That the evidence that the said second party, after fully understanding and accepting all the terms, covenants and conditions of this contract, including the provisions on the back hereof, and that they all constitute a part hereof, fully assents to each and all of the same, is his signature hereto.

These stipulations were expressly made part of the consideration for the rate, and the contract provided that: 'Said rate being less than the rate charged for shipments transported at carrier's risk, for which reduced rate and other considerations it is mutually agreed between the parties hereto, as follows.'

Based upon these stipulations and agreements, defendant pleaded the following defenses:

That at the time the plaintiff shipped the hogs in question, the defendant had on file with the Interstate Commerce Commission, and on file at Galt, Iowa, its tariff rates on hogs, as required by law. That in said tariff rates, so filed and in force at the time this shipment was made, there were specified therein two rates over defendant's line of railway from Galt, Iowa, to Chicago, Ill.; one where the value of the hogs did not exceed $10 per head, and the

other rate, which was higher, where the value of the hogs exceeded $10 per head. It was expressly provided in said tariff rates, so filed and in force at the time the shipment was made, that where hogs were shipped under the lower rate, in case of total loss of any of such hogs, the defendant's liability should not exceed $10 per head. That said tariff rates were open to the inspection of the public, and plaintiff selected the lower rate, and entered into a written contract with said defendant, which provided that in case of total loss of any of said hogs for which the defendant might be liable, payment therefor was to be made on the basis of the actual value at the time and place of shipment, but in no case should the defendant's liability exceed $10 per head. Said contract further provided that in making said contract the undersigned owner of the stock named herein expressly acknowledged that he had the option in making said contract under the tariff rates, either at the carrier's risk or upon a limited liability, and that he had selected the rate and liability named herein, and expressly accepts and agrees to all the stipulations and conditions herein named. A copy of said contract is hereto attached, marked 'Exhibit A,' and made a part of this answer.

That said tariff rates under which this shipment was made were binding upon both the defendant and the plaintiff, and neither were at liberty to disregard said tariff rates, without violating the law and being subject to prosecution by the United States government. This court has no authority or jurisdiction to change said tariff rates, by changing the amount of liability that the defendant assumed under said tariff rates at the time the hogs in question were shipped. That the recovery of plaintiff, if he is entitled to recover, is limited to $10 per head for each hog.

Count 3. The defendant further answering states that it kept on file with the Interstate Commerce Commission, and on file at Galt, Iowa, from where these hogs were shipped, its tariff rates, as required by law. That said tariff rates, duly published as required by law, gave the plaintiff a choice of two rates; one rate where the value of the hogs was $10 or less, and a higher rate, where the value of the hogs exceeded $10. The defendant states that the plaintiff, in order to secure the transportation of hogs

in question at less than the published tariff rates, wrong-
fully represented that the value of the hogs in question
did not exceed $10 per head, and that plaintiff signed the
contract marked 'Exhibit A,' a copy of which is hereto
attached, and represented therein that the value of the
hogs therein did not exceed $10 per head, when, as a
matter of fact, the value of said hogs at the time was much
in excess of $10 per head, which fact was known to the
plaintiff at the time said valuation was given, and was
not known to the defendant.   That no officer or agent of
the defendant at that time had seen the hogs, and had no
knowledge as to the value of said hogs in question, except
that obtained from the contract herein.

That the hogs in question were transported at the
lower rate, based on a valuation, not exceeding $10 per
head.   That plaintiff is not entitled to recover more than
$10 for each hog, and he is estopped from claiming that
the value of the hogs in question at the time of shipment
was more than $10 per head.

That the defendant further states that under the terms
of the contract under which the shipment was made the
recovery of the plaintiff is limited to the sum of $10 for
each animal, and states that plaintiff can not, in any event,
recover more than said amount.

The demurrer to these divisions of the answer was
sustained, and the appeal challenges the ruling.   Our Code,
section 2074, provides that:   "No contract, receipt, rule
or regulation shall exempt any railway cor-
1. CARRIERS: lim- poration engaged in transporting persons or
itation of lia-
bility by con- property from the liability of a common
tract: federal
statutes: power carrier, or carrier of passengers, which would
of state.
exist had no contract, receipt, rule or regu-
lation been made or entered into."   This section has here-
tofore been held applicable to such provisions as are relied
upon by appellant, and the Supreme Court of the United
States has held that the state, in virtue of its reserved or
police power, had authority to enact such a rule, even
though the shipment be interstate in character.   See *Solan
v. Railroad,* 95 Iowa, 260; *Lucas v. Railroad,* 112 Iowa,

594; *Winn v. Am. Ex. Co.,* 149 Iowa, 259. Also *Chicago, M. & St. Paul R. R. v. Solan,* 169 U. S. 133 (18 Sup. Ct. 289, 42 L. Ed. 688), and *Penn. R. R. v. Hughs,* 191 U. S. 477 (24 Sup. Ct. 132, 48 L. Ed. 268).

It is now argued with apparent confidence that the interstate commerce act (Act Feb. 4, 1887, chapter 104, 24 Stat. 379 (U. S. Comp. St. 1901, page 3154), with its amendments prior to the one of June 18, 1910, has so changed the situation that we should now hold the section of the Code inapplicable to interstate shipments, and, say, once for all, that, as our construction of it affects the published rates approved by the Interstate Commerce Commission, we should now abandon the rule announced in the Solan and other like cases. The fundamental proposition relied upon for this conclusion is that, as Congress has now acted upon the subject, the several states have no further control of the matter, and that the rates approved by the Interstate Commerce Commission must control. The difficulty with this proposition is counsel's inability to point to any act of Congress which undertakes to validate any such provision and stipulations as are relied upon by appellant. Such contracts as these have been held invalid by this court because exempting a carrier from an implied liability growing out of its undertaking to carry the property; and in previous cases it has been said that such exemptions are contrary to public policy, and void at common law. See cases heretofore cited. Upon this proposition there is conflict in the authorities, however, and the Supreme Court of the United States has adopted a contrary rule. See *Hart v. Railroad,* 112 U. S. 331 (5 Sup. Ct. 151, 28 L. Ed. 717). But practically all of the courts, including the Supreme Court of the United States, have held such a statute as is found in our Code as section 2074 within the reserved or police powers of the state, and not such a regulation of interstate commerce as to be inhibited by the Federal Constitution. See cases hitherto

cited. We have no doubt of the power of Congress to legislate upon this matter of limiting liability, or to give full recognition and validity to such contracts; but counsel for appellant have failed to point out any act of Congress which does so. Our own reading of the interstate commerce act fails to disclose any such provisions. It is not enough, as we think, that Congress has acted in the matter of interstate shipments, and assumed control thereof. That had been done when the *Solan* and the *Hughs* cases, *supra,* were announced. Definite action in recognition of such contracts as are here relied upon was necessary. No such express legislation is found, and appellant is driven to the necessity of finding recognition of such contracts by implication. The defendant seeks to limit its liability to the sum fixed in the contract because of the shipper's agreement, and it is contended that the Interstate Commerce Commission authorized the making of such contract in approving the rates filed by the company with the commission. It is alleged in the answer that the defendant had two rates for the shipment of stock, each fixed upon the valuation of the property; the low one being given to plaintiff because of the stipulations fixing the amount of liability, and the other a higher one, charged where there was no such limitation or valuation placed upon the property shipped. Concession must here be made that under the decisions of many courts such a contract is valid and binding, and fixes the amount of the shipper's recovery. See cases cited in volume 4, Elliott on Railroads, section 1510. As our rule differs from that announced by many of the courts, and as the construction and effect to be given our statutes is not one of general law, but for the courts of each jurisdiction, we must hold the provisions relied upon invalid, unless it be found that Congress has expressly or by necessary implication approved such stipulations in contracts relating to interstate shipments. *Davis*

*v. Railroad,* 93 Wis. 470 (67 N. W. 16, 1132, 33 L. R. A. 654, 57 Am. St. Rep. 935).

There is no express act of Congress upon the subject; but it is claimed that the Interstate Commerce Commission, acting for the government, has, in virtue of its authority over the subject, approved such contracts, and that state legislation upon the subject has thereby been abrogated. This, to our minds, is the pivotal point in the case. Counsel contend that to give force to our statute is to change a rate of freight authorized by the Interstate Commerce Commission. If that were all of the case, we should be inclined to agree with this contention. But it is provided in an amendment to section 20 of the interstate commerce act, found in U. S. Comp. St. Supp. 1909, page 1166:

2. SAME: filing of rates with interstate commerce commission: effect.

That any common carrier, railroad or transportation company, receiving property for transportation, from a point in one state, to a point in another shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof, for any loss, damage or injury to such property caused by it, or by any common carrier, railroad or transportation company to which such property may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company to which such property may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed: Provided: That nothing in this section shall deprive any holder of such receipt or bill of lading, of any remedy or right of action, which he has under existing laws. That a common carrier, railroad or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad or transportation company on whose lines the loss, damage or injury shall have been sustained, the amount of such loss, damage or injury, as it may be required to

pay to the owners of such property, as may be evidenced by any receipt, judgment or transcript thereof.

Again, section 9 of the interstate commerce act provides:

That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the Commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such carrier may be liable under the provisions of this act, in any District Court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods herein provided for he or they will adopt.

It seems to us that the amendment just quoted makes the initial carrier liable for all damages sustained, and that this liability can not be affected by any contract, rule, or obligation. We concede, however, that these amendments are not controlling upon the proposition here involved, and we cite them to show that, in so far as Congress had acted, prior to June 18, 1910, there was no attempt to vitalize such contracts as are here involved. We do not understand that the Interstate Commerce Commission approves and adopts all rates and conditions contained in any schedule of rates filed by a common carrier. At the time when the shipment in question was made the Interstate Commerce Commission had no authority to fix rates for future shipments. It did have power, however, to determine upon the reasonableness of rates, when that question was brought before it. *Interstate Com. v. Ala. R. R.,* 168 U. S. 144 (18 Sup. Ct. 45, 42 L. Ed. 414); *I. S. C. C. v. Cin. R. R.,* 167 U. S. 479 (17 Sup. Ct. 896, 42 L. Ed. 243). But it had no power to issue general orders in relation to carriers. *Tex. R. R. v. I. S. C. C.,* 162 U. S. 197 (16 Sup. Ct. 666, 40 L. Ed. 940).

From the mere fact that the defendant company filed its schedule of rates as required by law, no inference arises that the Commission agreed to these rates, or to all the proposed conditions of shipment. This rule is imperative, as we think, when applied to contracts or conditions against public policy, or contrary to the general law. It is said that the Commission has given its sanction to valuation clauses, such as the one relied upon in various cases; but it is not contended that it has ever approved the one relied upon by appellant, and there is reason to believe that it will not give its sanction to such a valuation as is relied upon in the instant case. That valuation is arbitrary, is one fixed by the carrier on its own motion, and gives the shipper no other option than to agree upon a valuation, not exceeding $10 per head, or pay a higher rate, which is not shown by the answer to be reasonable. Generally speaking, those courts which have approved limitations as to the amount of recovery in case of loss have done so upon the theory that there has been a *bona fide* agreed valuation between the shipper and the carrier, based upon the rate to be charged, and not a mere arbitrary limitation to a stipulated amount. See *U. S. Co. v. Backman,* 28 Ohio St. 144; *Hart v. Railroad,* 112 U. S. 331 (5 Sup. Ct. 151, 28 L. Ed. 717); *Kansas R. R. v. Simpson,* 30 Kan. 645 (2 Pac. 821, 46 Am. Rep. 104); *Moulton v. St. Paul R. R.,* 31 Minn. 85 (16 N. W. 497, 47 Am. Rep. 781); *Georgia R. R. v. Keener,* 93 Ga. 808 (21 S. E. 287, 44 Am. St. Rep. 197).

An eminent text-writer has stated the rule, as we understand it, in the following language:

Where, however, the valuation is an arbitrary one, made by the carrier, or the latter thus seeks to escape liability for its own negligence beyond the amount fixed, and such amount is obviously much less than the true value of the goods, a different question arises. An arbitrary and unreasonable limitation, inserted in a bill of lading by the

carrier, without any request or notice to the shipper, and without consideration or an opportunity to obtain a lower rate of freight in consideration thereof, is not binding upon the shipper. Some of the authorities cited in support of this proposition go still further, and seem to hold that the valuation must be made by the shipper; but there is conflict upon this point, and it is held in a leading case, and others which follow it, that it is immaterial whether the shipper fixes the value or not, so long as he agrees to it by accepting the bill of lading without objection. The most stubborn conflict among the authorities, however, is upon the question of the validity and effect of such a valuation and limitation where the carrier is guilty of negligence. But we believe that most of the apparently conflicting decisions can be reconciled in accordance with the following rules: (1) A *bona fide* contract, fairly made in advance, upon sufficient consideration, fixing the value of the property, or the rule for ascertaining its value in case of loss or injury, even if the carrier is guilty of negligence, is valid and enforceable, and, if based upon a lower rate of freight in proportion to the decreased liability, 'will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuation.' (2) A stipulation arbitrarily limiting the amount of recovery, in case of the negligence of the carrier, without regard to the value of the property, is invalid, except, perhaps, in the few jurisdictions in which a carrier can contract for an exemption from liability for its own negligence. (3) The agreement as to value must be made in good faith, and not forced upon the shipper by unreasonable rates for a higher valuation. (4) A carrier may make reasonable regulations, graduating its compensation according to the value of the property, and requiring a disclosure of such value for the purpose of fixing its compensation, and providing that in case of the failure of the shipper to disclose the value as required it shall be deemed not to exceed a certain specified sum. (5) If the shipper, upon inquiry duly made by the carrier as to the value of the goods, gives a false valuation, in order to obtain reduced rates, and deceives the carrier thereby, he will be estopped by his

fraud from claiming and recovering any greater amount in case they are lost or injured. 4 Elliott on Railroads, section 1510.

But we need not speculate upon this, for it is not contended that the stipulations in question have ever been approved by the Commission. It will be observed that the action is bottomed upon negligence, and that for present purposes it must be assumed that the loss which plaintiff suffered was due to defendant's negligence. It must also be assumed that the carrier arbitrarily fixed the maximum value of the animals shipped, and that the shipper had no option but to accept this arbitrary valuation, or to pay a higher rate. The reasonableness and justness of this higher rate is not shown, but assumed without any showing of record as to what it is. Consideration should also be given to the fact that it is not an action in which any complaint is made of the rate as fixed. The gist of the complaint is defendant's failure to perform its common law and statutory duty; that is to say, negligence. Fundamentally defendant is relying upon a contract limiting its liability for that negligence, and in order to do so it must present such a contract as the courts will approve. The principal case relied upon by appellant is far from being conclusive. That case was an action to recover for alleged overcharge and for exactions which were alleged to be unreasonable, and the opinion written by the present Chief Justice is far from controlling on the proposition now before us. The case is *Tex. R. R. Co. v. Abilene Co.,* 204 U. S. 426 (27 Sup. Ct. 350, 51 L. Ed. 553). That decision, it seems to us, goes no farther than to hold that a shipper can not maintain an action to obtain relief from an alleged unreasonable freight rate, exacted from him for an interstate shipment, where such rate has been filed with the Interstate Commerce Commission, and promulgated as provided by the act to regulate commerce. The question in the instant case is not one primarily of rates, but of

the right of the carrier to limit its liability for negligence. Of course, it is permissible to draw analogies from the cited case; but there is nothing in the decision which holds to the doctrine that the Interstate Commerce Commission has, either expressly or impliedly, ratified and approved such contracts as are here involved. Our conclusions find support in *Latta v. Chicago, St. P., M. & O. R. R.,* 172 Fed. 850 (97 C. C. A. 198).

II.   It is argued, however, that our construction of the law affords a ready means whereby rebates may be offered to shippers, and that for this reason it should not be adopted. This argument, while plausible, is not persuasive. Of course, there are many devices which might be adopted in order to avoid the law against rebates and discriminations; but it seems to us that in upholding the stipulations relied upon in this case we would point the way to unlawful discrimination in rates quite as effectively as by denying the validity thereof. It must be assumed, in solving the question now before us, that plaintiff suffered a loss to the extent claimed, and that defendant is relying upon a contract limiting its liability for such loss. No rebate is being granted to the shipper, either directly or inferentially. Compensation for his loss is all he seeks, and is all that has been awarded. No discrimination was intended in granting him the rate which was charged, and, even if that had been the intent, we doubt whether the defendant is in position to avail itself of such discrimination, in an action against it for negligence. Even if fraud on the part of the shipper is charged, it is unavailing under the rule announced in *Winn v. Am. Exp. Co., supra.* See, also, *Betts v. Railroad,* 150 Iowa, 252. It is not alleged that the rate given the plaintiff was discriminatory in character, or that it was unreasonable. The sole defense is that he agreed to a limitation upon the carrier's liability in case of injury to the property,

3. SAME: interstate shipments: contract liability: invalidity: effect.

even if such injuries were due to negligence; and it is argued that such agreement is good, because the Interstate Commerce Commission approved thereof, or so treated the schedule filed as to ratify, not only the rate, but all proposed stipulations and agreements contained in the contracts entered into between the carrier and the shipper, or embodied in the bill of lading issued by the railroad company. There is, as we think, no merit in the contention that a rebate or concession has been granted to the shipper. Cases relied upon by appellant in support of its present contention are not in point.

III. Suggestion is made that our construction of the law gives to plaintiff a less rate than that required by law, due to the filing of defendant's schedule of rates. For some purposes this may be assumed; but it does not follow that the penalty is a forfeiture on the part of plaintiff of all damages sustained by him, or necessarily limits the amount of recovery. The thought is, of course, worthy of consideration in arriving at a proper decision as to the effect to be given the stipulations in question, but it is not controlling. After all is said, we think the inquiry is limited to a question of law, independent of the schedules filed. If the stipulations relied upon are invalid, either by statute or at common law, and if the state has power to enact such a statute as section 2074 of our Code, then it must be assumed that the Interstate Commerce Commission did not approve of the conditions or limitations contained in the defendant's bill of lading or shipping contracts. Congress had not assumed to legislate upon the subject of the legality of these contracts, and the field is open to state action, unless the interstate commerce act is to be so construed as to forbid all action by the states with reference to the validity of contracts entered into by shippers and carriers within their respective jurisdictions. We do not believe that this construction should be placed upon the interstate commerce act, and

4. SAME.

it is certainly true that the Supreme Court of the United States has not yet announced such a doctrine. That the Congress of the United States might do so in all cases of interstate shipment we have no doubt; but until it does the matter is unquestionably left to state control. Finally, it must be remembered that the question of rates for an interstate shipment is only incidentally involved; that the action is not to recover an overcharge, or to have a readjustment of rates; that the contract provisions relied upon have never been expressly approved by Congress or the Interstate Commerce Commission; that the question is one of general law, and goes simply to the inquiry. Are the conditions and stipulations relied upon valid limitations upon plaintiff's right to recover for negligence? We might. well have treated the question as settled by *Winn v. Express Co., supra,* but the argument now presented contains some new phases, which we thought well to consider, and the propositions decided in the *Winn* case have been elaborated, in order to justify the announcement there made. We are willing to concede the force of appellant's argument, and to agree that the question is by no means free from doubt; but our former decisions are such that, to be consistent, we must hold the stipulations limiting liability invalid, contrary to our statute, and opposed to sound public policy. It may be that there should be a general rule, applicable to all interstate shipments, holding such contracts as are relied upon either valid or invalid, in order that the extent of liability may not depend upon the place of contract; but this suggestion has no doubt occurred to members of Congress, and with full knowledge of the conflict in court decisions they have not seen fit to legislate upon the subject. The matter is still open to state action or inaction, and the courts in the several jurisdictions must either uphold or deny the legal efficacy of contracts limiting liability; the conclusion being dependent upon state statutes, or upon the view entertained by the particular

court of the public policy of such contracts. We are fully committed to the doctrine that such contracts are invalid, and we see no reason for holding that this rule has been abrogated by Congress or by the Interstate Commerce Commission. The ruling on the demurrer seems to be correct, and the judgment must be, and it is, *affirmed*.