HENRY LEFEBURE, Appellant, v. AMERICAN EXPRESS COMPANY, Appellee.

Carriers: LOSS IN TRANSIT: REPRESENTATIONS AS TO VALUE: FRAUD:
1  EVIDENCE. In this action for the loss of valuable horses while in transit, the evidence is reviewed and held insufficient to show that the shipper fraudulently represented the value of the horses for the purpose of securing a lower rate of transportation, so as to prevent recovery of their real value.

**Same:** CONTRACTS LIMITING LIABILITY: REASONABLENESS. Under the federal statutes regulating interstate commerce, a carrier may by contract with the shipper limit its liability in case of loss or destruction of the property, not the result of its own negligence or that of its servants; provided the contract is just, reasonable, fair and openly made. In the instant case the contract limiting the liability in case of loss of valuable stallions to one hundred dollars each, is not so unreasonable in its terms that the court should refuse to enforce it, if fairly made.

**Same:** ADMISSION OF EVIDENCE. On the issue as to whether the contract limiting defendant's liability was fairly entered into, the court should have permitted plaintiff to state, after the evidence was in and a motion for directed verdict had been submitted, that he had no knowledge of any other rate of shipment for that class of property than that stated in the contract.

**Same:** BILL OF LADING: ACCEPTANCE: WHEN BINDING. In the absence of fraud, imposition or the like, the acceptance of a bill of lading in which the terms are clearly stated, is sufficient to make a contract which will bind the parties to any provision therein which is reasonable and not against public policy. Thus where the agent of a carrier presented plaintiff a bill of lading to sign, and he signed and accepted the same without reading it, simply because of the agent's haste and the insufficiency of light, he was bound by the provision contained therein limiting liability in case of loss, and could not say that the contract was not fairly entered into, especially as he was a frequent shipper and accustomed to handling bills of lading though neglecting to read them; as in the absence of fraud his negligence would not excuse him in signing and accepting the instrument.

**Same:** FAIRNESS OF CONTRACT: LAW APPLICABLE. The question of whether a special contract in a bill of lading of an interstate shipment, limiting the carrier's liability in case of loss of the property, was fairly entered into, is to be determined by the law of the state; the federal decisions or those of other states are not controlling.

**Same:** DAMAGES: INTEREST: TENDER: TAXATION OF COSTS. Where a shipper sues for the value of property lost in transit he is entitled to interest on the sum due from the time of bringing suit; and a tender of simply the principal sum without interest is not sufficient to authorize a taxation of all the costs to the plaintiff.

*Appeal from Linn District Court.*—HON. MILO P. SMITH, Judge.

Friday, February 21, 1913.

Action to recover damages for the death of two imported draft stallions, due to the negligence of the defendant, a common carrier, which undertook to transport them from the city of New York to Fairfax, Iowa. The trial court, upon motion, directed a verdict for the plaintiff in the sum of $200, and taxed the costs to the plaintiff. Plaintiff alone appeals. *Affirmed* in part and *Reversed* in part.

*Redmond & Stewart*, for appellant.

*Parker, Parrish & Miller* and *Dawley & Wheeler*, for appellee.

Deemer, J.—Plaintiff is a dealer, breeder, and importer of high-grade horses, living at Fairfax, in this state. He concluded to make a trip to Europe, during the fall or early winter of the year 1909, to purchase some horses, and inquired of the local agent of the defendant company, at the city of Cedar Rapids in this state, as to the car load express rates on horses from New York City to his home town, and was informed that it was $350 per car. Following out his purpose, he, plaintiff, went to Europe, where he purchased twenty-six head of horses, fifteen of which were Belgian and eleven were French. These he shipped by boat to New York City, the port of entry; and, when nearing New York City, he sent a wireless message to the defendant, notifying it of the approach of the vessel.

1. Carriers: loss in transit: representations as to value: fraud: evidence.

Plaintiff testified as follows regarding this matter:

I purchased horses in Europe for shipment to Fairfax— twenty-six head. They were shipped from Europe to New York, Mr. Oliver and myself accompanying the shipment. I mailed the invoice of the French horses to the American

Express Company, and it received it before the arrival of the horses. The invoice of the Belgian horses I had in my possession. . . . There were twenty-six horses in the shipment, one of which was sold on board ship. On arriving at New York I was met by an agent of the American Express Company, on the wharf; it was Sunday morning. He asked me whether I had the other invoice; he said he had received one, and asked if I had my bill of lading. I said 'Yes'; then he told me to be on hand at the office Monday morning at 9 o'clock and they would proceed to clear the horses. I delivered the other invoice at the office of the American Express Company, on Monday morning. Q. Now, did you have anything to do with the official process through the United States government officer there of clearing or complying with their regulations, or who did that, if anybody? Mr. Miller: That is objected to as being immaterial. Objection overruled. Defendant excepts. A. They did that. I have not seen the invoices for the horses since I gave them to the agents of the express company. The original invoices for the horses imported are retained in the United States Custom House in New York City. I obtained certified copies of these invoices from the United States Custom House at New York. . . . It was six or seven, possibly eight hours after I delivered the invoices on Monday morning before the horses were unloaded from the vessel. The steamship company unloaded the horses from the ship and turned them over to the employees of the American Express Company on the docks. The horses were loaded into the cars by the employees of the American Express Company, which company furnished the cars. The employees arranged the stallions in the cars, tied them in the cars. The loading into the cars was finished at six, or possibly seven o'clock. It was dark; it was early in December. I and Mr. Oliver were at the cars when the loading was finished. Just before the cars were started an employee of the express company—a well-dressed man who seemed to superintend the work—presented me papers for my signature. Exhibits 3 and 4 are the papers. Both these papers were presented to me at the same time and place by this same man in the horse car, he saying to me, 'Here are the contracts ready to sign'—he wanted me to hurry and sign them, as he wanted to make some car or train. There was no light there other than the little railroad lanterns. Mr. Oliver and this gentleman, the

agent, were the only ones present when I attached my signature. Q. Did you read the contracts? A. No, sir. Mr. Miller: Wait; that is objected to as being immaterial and irrelevant. The Court: The answer may stand. (Defendant excepts.) At that moment I knew the cars were about to start on their way to Fairfax, and did start a few minutes thereafter. I did not see the agent again after attaching my signature; he leaving immediately as soon as he got my signature. Q. You may state whether or not at the time you placed your signature, as you have testified, to these contracts, Exhibits 3 and 4, you knew that there had been a value placed on these horses in that contract; that is, of $100 each. A. No; I did not. Mr. Miller: That is objected to as being incompetent— the witness being presumed to know—and irrelevant and immaterial. The Court: You may answer it. (Defendant excepts.) Q. Did you see these contracts, Exhibits 3 and 4, at any time or place, or have anything to do with their formulation prior to the time that they were presented to you in the car in the night for your signature? Mr. Miller: That question is objected to as being immaterial, for the reason that the witness has already testified that he signed the contracts, Exhibits 3 and 4, and he is therefore bound by them. The Court: You may take the answer. (Defendant excepts.) A. I did not until they were put upon my knee for signature. Q. Did any one, for or on behalf of the American Express Company, ask you at any time the value of these horses, or to place a value upon them? (Objected to by defendant as immaterial, for the reason that the witness has already testified that he signed the contracts, Exhibits 3 and 4, and he is therefore bound by them.) A. No. Q. Did you at any time tell any of the officers or agent of the company the value of these horses? A. No. Mr. Oliver was present at the time these contracts were placed upon my knee for signature, and signed at the same time and place. The cars were routed to Chicago by Detroit; Mr. Oliver and I went in the cars with the horses on the way from New York to Chicago, and Fairfax—Mr. Oliver in one car and I in the other. . . . Q. You testified, I believe, that you didn't inform the American Express Company of the value of these animals—didn't tell them? A. No; I didn't tell them. Q. The only information the American Express Company derived as to the value of these horses would be from the invoices which you say were turned over

to them? A. Yes, sir. Q. That is, Exhibits 1 and 2? A. Yes, sir. Q. Referring to Exhibit 1 again, it says, eleven Percheron stallions—here is 1,150 pounds—that is, pounds sterling? A. Yes, sir. Q. That refers to the aggregate value of the whole eleven Percheron stallions? A. Yes, sir. Q. How is that value determined—by what you paid? A. That is what I paid the man for the horses; they were all bought in one bunch. Q. You stated that you had nothing whatever to do with the process of clearing these animals from the custom house; isn't it a fact that you went to the custom house and signed the entry? A. Yes, sir. Q. So you did have something to do with it? A. I accompanied the express broker or agent. Q. And signed the entry? A. Yes, sir; and then I believe I was sworn. I think it was six or seven o'clock at night when the unloading was completed at the pier in New York, and the contracts were signed as soon as the loading was finished. I may have signed the contracts before 6 o'clock that night. I am not positive as to the time. Q. Are you sure the loading was finished when you signed the contracts? A. Yes, sir; the date was December 6th. I recall the man who presented these contracts for signature. I see him in the courtroom; that is the gentleman standing up who presented Exhibits 3 and 4 for my signature. I was in the car at the time. The cars are provided with lighting facilities; they have gaslights, but were not lighted at the time I signed these contracts. We had to call for a lantern for me to sign my name on the papers; I signed them by lantern light. I didn't ask for time to read them over; I did not make any objection to signing the contracts without reading them over; we were in a hurry. I knew it was a shipping receipt or contract of some kind; I didn't know what it provided; I knew the contract was for the transportation of two car loads of horses from where they were at the pier in New York to my home at Fairfax, Iowa, and I supposed that was what I was doing. I didn't read any part of the contract; I simply looked at the place for my signature and signed. These contracts, Exhibits 3 and 4, have been in my possession ever since, except the time they have been in my attorney's hands. . . . I am forty-five years, and able to read and write the English language; read it quite readily. Q. You would, had you undertaken to do so, had no difficulty whatever in reading Exhibits 3 and 4? A. All I would need is the time. Q. Did

you ever read one of these contracts? A. No. sir; I did not, not until after this accident. I have a few similar contracts in my possession. Q. You never read one? A. No, sir. The name 'H. Lerebure' on defendant's Exhibit A is my signature. I don't remember whether I had a duplicate of that contract or not; I usually do. I remember taking stock to the State Fair. I did not read the contract at that time; I have never read any of those contracts. Q. I will ask you why you didn't read them, Mr. Lefebure? A. I never took time; it would take a man at least an hour to read one. Q. You have had an opportunity, though? A. Yes; I think so. Exhibit B bears my signature. I made that shipment and signed Exhibit B in New York. I don't remember, but I suppose I did have a duplicate of it. I didn't read it, though I had an opportunity to read it. Exhibit C bears my signature, and I suppose I did have a duplicate of it. Q. You had opportunity to read it, but you never did? A. I don't remember ever having read one of those contracts in my life until after that accident; I can say that and say it truthfully. Q. Calling your attention again to your signature of the contracts, plaintiff's Exhibits 3 and 4, I will ask you if it is not a fact that Mr. Dolan, the agent who presented the contract to you for signature, did call your attention to article 5 and ask you whether that was satisfactory? A. I know he did not. Q. Do you testify that he did not? A. I certainly do. Q. Don't you know that when he called your attention to the article you stopped for a little bit—half a minute or such a matter—and looked at it, saying, 'Is that satisfactory to you?' A. No; he did not—no express agent ever did. Q. At the time you signed the contracts, Exhibits 3 and 4, there was no engine attached to the cars, was there? A. No, sir. Q. They were on the float by the pier? A. Yes, sir. Q. After you had completed loading and signed the contract the float bearing the cars was taken to where? A. Across the Hudson river; I couldn't tell the point. Q. What road did they take from there? A. I think the west shore of the Hudson; I don't know the name of the road. I don't know whether it was on the New York or Jersey side. We came through Buffalo, New York. . . . Q. I will ask you to state if at any time in any shipment by you made as evidenced by Exhibits 3 and 4, or defendant's Exhibits A, B, C, and D, the defendant American Express Company ever called your attention to that clause 5, or ever

asked you to declare the value for the purpose of fixing a
rate in any of these contracts? A. No; that is a question
that has never been asked me by any express agent when
shipping live stock.

This testimony was corroborated by the man, Oliver; and
the evidence shows without controversy that one of the horses
was actually worth about $1,000, and the other $1,400. We
must assume from the nature of the finding, from which de-
fendant has not appealed, that these horses were killed in the
city of Chicago, through the negligence of the defendant, and
that neither plaintiff nor the man, Oliver, who was with him
was guilty of any negligence contributing to the injury. The
two horses were dead when they reached Fairfax, and plain-
tiff's action is to recover the reasonable value thereof.

Defendant, among other things, states that the shipment
of the horses was made under a written contract, entered into
between it and the plaintiff in the state of New
2. SAME: con-
tracts limiting    York; that the contract was to be, and was
liability : rea-
sonableness.      partially performed in that state, and that
by the express terms of the contract it was agreed between
the parties that all questions arising thereunder should be
determined by the laws of that state; that among other things
the contract of affreightment, bill of lading, or limited live
stock contract contained the following provisions:

Notice to Shippers.—The shipper will value his stock, which
valuation will be inserted in the contract, and the charge
for carriage and any liability for damage will be
based on such violation.

American Express Company—Limited Liability Live Stock.

Contract.

This contract, made at N. Y. City this 6th day of Dec.
1909, between American Express Company, of the first part,
hereinafter called Express Company, and Henry Lefebure
hereinafter called the Shipper, party of the second part.

1. Witnesseth: That the Express Company undertakes to forward to the nearest point to destination reached by it (or if destined to a point beyond its lines, to forward to transfer point convenient to destination, and there deliver to connecting carrier to complete the transportation), the animals hereinafter mentioned, of which the Shipper declares himself to be the owner (or duly authorized agent of the owner), to wit:

(Enter on the following lines, in words, not in figures, the number and kind of animals or birds.)

Twelve horses.

consigned to Henry Lefebure at Fairfax, Iowa, for the sum of three hundred fifty dollars and ——— cents, *which charge is fixed by and based upon the value of said animals as declared by the Shipper,* as hereinafter mentioned.

2. And in consideration of the premises, said parties agree: That the Shipper, before delivering the said animals to said Express Company, demanded to be advised the rates to be charged for the carriage of said animals as aforesaid, and thereupon was offered by said Express Company alternative rates proportioned to the value of said animals, such value to be fixed and declared by the Shipper and according to following tariff charges, viz.:

Enter below in all cases what the express charges are or would be at the values specified in section 3.

3. For horses, jacks or mules of a value not exceeding $100.00 each ........................... $———

For bulls, burros, calves, colts, cows, deer, dogs, elks, goats, hogs, ponies, sheep, steers or animals not otherwise specified, of a value not exceeding $50.00 each ............................... ———

For cats, ferrets, guinea pigs, rabbits, fancy pigeons or fancy fowls, or other live fowls, birds or reptiles, of a value not exceeding $5.00 each.... ———

For a car load of horses, jacks or mules of a value not exceeding $100.00 for each animal......... $   350.00

For a car load of bulls, burros, calves, colts, cows, deer, dogs, elks, goats, hogs, ponies, sheep, steers or animals not otherwise specified, of a value not exceeding $50.00 for each animal.............. ———

4. And said parties further agree that any excess value declared by the Shipper, over and above the limit of value fixed by Company's rate, is to be charged for, in addition to the above mentioned charge, according to the following schedule to wit:

| When the merchandise rate of the company between the points of shipment of animals is made is | The additional charge for excess value will be |
|---|---|
| Not over $2.00 per 100 lbs..........1% on excess valuation. | |
| Over $2.00 per 100 lbs. and not over $3.00 per 100 lbs..........1½% on excess valuation. | |
| Over $3.00 per 100 lbs. and not over $5.00 per 100 lbs...........2% on excess valuation. | |
| Over $5.00 per 100 lbs...........2½% on excess valuation. | |

5. The Shipper, in order to avail himself of said alternative rates, and in consideration thereof, being asked by the Express Company to value said property, now declares the value hereinafter mentioned to be the true values of said animals so to be shipped as follows, to wit:

(Number and kind)   Twelve          .   Value each  $100.00

(Shipper must in all cases be required to declare value.)

6. The Shipper agrees that the responsibility of the Express Company shall be that of a forwarder only and not that of a common carrier, and that the Express Company shall not be liable for the conduct or acts of the animals to themselves or to each other, such as biting, kicking, gorging or smothering, nor for loss or damage arising from the condition of the animals themselves or which results from their nature or propensities, which risks are assumed by the Shipper. The Shipper hereby releases and discharges the Express Company from all liability for delay, injuries to or loss of said animals from any cause whatever, unless such delay, injury or loss shall be caused by the negligence of the agents or employés of the Express Company, and in such event the Express Company shall be liable only to the extent of actual damage to the animal or animals injured, which shall in no event exceed the sum herein declared by the Shipper to be the value thereof; and for the purpose of ascertaining or

assessing such damage, whether the same be a total or a partial loss, the value of said animals as herein declared by the Shipper shall be conclusively deemed to be the true value thereof.   .  .  .

Signed in duplicate.

American Express Company.
By M. M. Noon, Agent.
H. Lefebure,
(Owner or Duly Authorized Agent
of the Owner.)

Defendant pleads these stipulations and agreements as a defense in whole or in part to plaintiff's cause of action. Before proceeding further it should be observed that section 6 of this contract is not relied upon as a defense, doubtless for the reasons: (1) That defendant undertook to perform the entire contract; and (2) the provision limiting its liability to loss occurring on its lines is invalid under the Interstate Commerce Act as amended. See *Cramer v. R. R. Co.*, 153 Iowa, 103, and cases cited. So that this stipulation in the contract is eliminated. Defendant relies, however, upon the provision limiting its liability to the sum of $100 on each horse, and also pleads that the charges were in accord with the schedule of rates filed by it with the Interstate Commerce Commission, and that such Commission has held such schedule of alternative rates valid and binding upon the shipper.

The loss or damage occurred in the state of Illinois, but, as we understand, neither party is contending that the law of that state is the proper one for the determination of this controversy. However this may be, defendant has not pleaded the law of that state; and, if it becomes material, we must assume that the law in that jurisdiction is the same as our own.

It was also averred by defendant that plaintiff fraudulently represented the value of the horses in order to secure the minimum rate, and that by reason thereof he is not entitled to recover in this action. It is enough to say that plain-

tiff's testimony from which we have quoted clearly negatives the idea of fraud on his part. According to his version of the matter he was not called upon to place any value upon the horses, and in fact did not do so, unless it be held that by signing the contract he in fact represented that the horses were worth but $100 each in order to secure a lower rate for the transportation of the animals. Fraud is something different from negligence, and involves some conscious act upon the part of him who is charged therewith. This element is wanting here. Moreover, defendant through its agents knew from the invoices which were placed in its hands that the animals were each worth more than $100 unless they were so dumb that they could not understand figures, and had no knowledge of what the sign for pounds sterling is. Again, the statement made by the United States collector of customs, which was placed in the hands of defendant's agents, contained a statement as to the value of the horses expressed in terms of "francs" carried out in terms of dollars under the dollar sign. So that in no event was defendant deceived as to the actual value of the horses. The fraud issue then is out of the case.

Since this case was tried in the district court and since the original submission in this court, the Supreme Court of the United States has held that, since the amendment of the original Interstate Commerce Act (Act Feb. 4, 1887, chapter 104, 24 Stat. 386 [U. S. Comp. St. p. 3169]), passed June 29, 1906, chapter 3591, section 7, 34 Stat. 593 (U. S. Comp. St. Supp. 1911, p. 1307), known generally as the "Carmack Amendment," and especially in view of the twentieth section thereof, all state regulations and decisions relative to the liability of carriers on interstate shipments have been superseded, and that there is now one national law upon the subject, which must govern; and, in applying the act to such limited liability contracts as the one upon which defendant relies, that there is nothing in the aforesaid amendments which in any way prohibits the making of such contracts and

nothing in public policy forbidding them. It approved of the general rule holding that a common carrier cannot exempt itself from liability for its own negligence or for that of its servants—citing *York v. R. R. Co.*, 3 Wall. 107 (18 L. Ed. 170); *Railway Co. v. Lockwood*, 17 Wall. 357 (21 L. Ed. 627); *Bank v. Express Co.*, 93 U. S. 174 (23 L. Ed. 872); *Hart v. R. R. Co.*, 112 U. S. 331 (5 Sup. Ct. 151, 28 L. Ed. 717)—and said:

The rule of the common law did not limit his liability to loss and damage due to his own negligence or that of his servants. That rule went beyond this, and he was liable for any loss or damage which resulted from human agency, or any cause not the act of God or the public enemy. But the rigor of this liability might be modified through any fair, reasonable, and just agreement with the shipper which did not include exemption against the negligence of the carrier or his servants. The inherent right to receive a compensation commensurate with the risk involved the right to protect himself from fraud and imposition by reasonable rules and regulations, and the right to agree upon a rate proportionate to the value of the property transported.

It has therefore become an established rule of the common law, as declared by this court in many cases, that such a carrier may by a fair, open, just, and reasonable agreement limit the amount recoverable by a shipper in case of loss or damage to an agreed value made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk. *York Co. v. Railroad*, 3 Wall. 107 (18 L. Ed. 170); *Railroad v. Lockwood*, 17 Wall. 357 (21 L. Ed. 627); *Hart v Pennsylvania Railroad*, cited above; *Phœnix Ins. Co. v. Erie Trans. Co.*, 117 U. S. 312, 322 (6 Sup. Ct. 1176, 29 L. Ed. 873); *Steam Co. v. Phenix Ins. Co.*, 129 U. S. 397, 442 (9 Sup. Ct. 469, 32 L. Ed. 788); *New York, etc., Ry. v. Estill*, 147 U. S. 591, 619 (13 Sup. Ct. 444, 37 L. Ed. 292); *Primrose v. W. U. Tel. Co.*, 154 U. S. 1, 15 (14 Sup. Ct. 1098, 38 L. Ed. 883); *Chicago, etc., Ry. v. Solan*, 169 U. S. 133, 135 (18 Sup. Ct. 289, 42 L. Ed. 688); *Calderon v. Steamship Company*, 170 U. S. 272, 278 (18 Sup. Ct. 588, 42 L. Ed. 1033); *Pennsylvania Railroad v. Hughes*, 191 U. S. 477, 485 (24 Sup. Ct. 132, 48 L. Ed. 268).

That such a carrier might fix his charges somewhat in proportion to the value of the property is quite as reasonable and just as a rate measured by the character of the shipment. The principle is that the charge should bear some reasonable relation to the responsibility, and that the care to be exercised shall be in some degree measured by the bulk, weight, character, and value of the property carried.

Neither is it conformable to plain principles of justice that a shipper may understate the value of his property for the purpose of reducing the rate, and then recover a larger value in case of loss. Nor does a limitation based upon an agreed value for the purpose of adjusting the rate conflict with any sound principle of public policy. The reason for the legality of such agreements is well stated in Hart v. Pennsylvania Railroad, cited above, where it is said: 'The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principle of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefits of the contract if there is no loss, and to repudiate it in case of loss.'

The statutory liability, aside from responsibility for the default of a connecting carrier in the route, is not beyond the liability imposed by the common law, as that body of law applicable to carriers has been interpreted by this court as well as many courts of the states. *Greenwald v. Barrett,* 199 N. Y. 170, 175 (92 N. E. 218, 35 L. R. A. [N. S.] 971) ; *Bernard v. Adams Express Co.,* 205 Mass. 254, 259 (91 N. E. 325, 327, 28 L. R. A. [N. S.] 293, 18 Ann. Cas. 351). The exemption forbidden is, as stated in the case last cited, 'a statutory

declaration that a contract of exemption from liability for negligence is against public policy and void.' This is no more than this court, as well as other courts administering the same general common law, have many times declared. In the same case just such a stipulation as that here involved was upheld, the court saying: 'But such a contract as we are considering in this case is not an exemption from liability for negligence in the management of property within the meaning of the statute. It is a contract as to what the property is, in reference to its value. The purpose of it is not to change the nature of the undertaking of the common carrier, or limit his obligation in the care and management of that which is intrusted to him. It is to describe and define the subject-matter of the contract, so far as the parties care to define it, for the purpose of showing of what value that is which comes into the carrier's possession, and for which he must account in the performance of his duty as a carrier. It is not in any proper sense a contract exempting him from liability for the loss, damage, or injury to the property, as the shipper describes it in stating its value for the purpose of determining for what the carrier shall be accountable upon his undertaking, and what price the shipper shall pay for the service and for the risk of loss which the carrier assumes.'

In *Greenwald v. Barrett*, cited above, the same conclusion was reached as to the nature of the liability imposed and the purport of the exemption forbidden, the court, among other things, saying: 'The language of the enactment does not disclose any intent to abrogate the right of common carriers to regulate their charges for carriage by the value of the goods or to agree with the shipper upon a valuation of the property carried. It has been the uniform practice of transportation companies in this country to make their charges dependent upon the value of the property carried, and the propriety of this practice and the legality of contracts signed by the shipper agreeing upon a valuation of the property were distinctly upheld by the Supreme Court of the United States in *Hart v. Pennsylvania R. R. Co.*, 112 U. S. 331, 341 (5 Sup. Ct. 151, 28 L. Ed. 717).' See *Adams Exp. Co. v. Croninger*, 226 U. S. 491 [33 Sup. Ct. 148, 57 L. Ed. —], decided at October term, 1912, opinion filed January 6, 1913).

In another opinion of the same court filed on the same day in *C B. & Q. R. R. v. Miller,* 226 U. S. 513, (33 Sup. Ct. 155, 57 L. Ed. —) it was said:

In *Adams Express Company v. Croninger,* just decided, we reached the conclusion that by the provisions of the twentieth section of the latter act Congress had manifested a purpose to take possession of the subject of the liability of a carrier by railroad for interstate shipments, and that the regulations therein had superseded all state regulations upon the same subject. This case is therefore controlled by that judgment. It follows that the Supreme Court of Nebraska erred in applying to the contract here involved the provisions of the Iowa statute, and of the Constitution of the state of Nebraska, and in refusing to apply the exclusive regulation prescribed by the twentieth section of the act of 1906, as that provision has been construed by this court in the *Croninger* case, above referred to.

And in *Chicago, M. & St. P. R. R. v. Latta,* 226 U. S. 519 (33 Sup. Ct 155, 57 L Ed —), decided on the same day, the rule was also approved. The only limitations upon the rule as stated is that the contract must be fair, open, just, and reasonable. Or, as said in the *Hart* case, *supra,*

It is just to hold the shipper to his agreement fairly made as to value, even where the loss or injury has occurred through the negligence of a common carrier.

Although a little out of its proper connection, we quote the following from that decision:

It must be presumed from the terms of the bill of lading, and without any evidence on the subject, and especially in the absence of any evidence to the contrary, that, as the rate of freight expressed is stated to be on the condition that the defendant assumes a liability to the extent of the agreed valuation named, the rate of freight is graduated by the valuation. Especially is this so as the bill of lading is, what its heading states it to be, 'a limited liability live stock contract,' and

is confined to live stock. Although the horses, being race horses, may, aside from the bill of lading, have been of greater real value than that specified in it, whatever passed between the parties before the bill of lading was signed was merged in the valuation it fixed; and it is not asserted that the plaintiff named any value, greater or less, otherwise than as he assented to the value named in the bill of lading by signing it. The presumption is conclusive that if the liability had been assumed on a valuation as great as that now alleged, a higher rate of freight would have been charged. The rate of freight is indissolubly bound up with the valuation. If the rate of freight named was the only one offered by the defendant, it was because it was a rate measured by the valuation expressed. If the valuation was fixed at that expressed, when the real value was larger, it was because the rate of freight named was measured by the low valuation. The plaintiff cannot claim a higher valuation on the agreed rate of freight. . . . It is now the settled law that the responsibility of a common carrier may be limited by an express agreement made with his employer at the time of his accepting goods for transportation, provided the limitation be such as the law can recognize as reasonable, and not inconsistent with sound public policy. It was held that the stipulation as to the time of making a claim was reasonable and intrinsically just, and could not be regarded as a stipulation for exemption from responsibility for negligence, because it did not relieve the carrier from any obligation to exercise diligence, fidelity, and care. . . . As a general rule, and in the absence of fraud or imposition, a common carrier is answerable for the loss of a package of goods, though he is ignorant of its contents, and, though its contents are ever so valuable, if he does not make a special acceptance. This is reasonable, because he can always guard himself by a special acceptance, or by insisting on being informed of the nature and value of the articles before receiving them. If the shipper is guilty of fraud or imposition, by misrepresentating the nature or value of the articles, he destroys his claim to indemnity, because he has attempted to deprive the carrier of the right to be compensated in proportion to the value of the articles and the consequent risk assumed, and what he has done has tended to lessen the vigilance the carrier would otherwise have bestowed. 2 Kent. Comm. 603, and cases cited; *Relf v. Rapp,* 3 Watts & S. [Pa.]

21 (37 Am. Dec. 528) ; *Dunlap v. Steamboat Co.*, 98 Mass. 371 ; *Railroad Co. v. Fraloff*, 100 U. S. 24 (25 L. Ed. 531). This qualification of the liability of the carrier is reasonable, and is as important as the rule which it qualifies. There is no justice in allowing the shipper to be paid a large value for an article which he has induced the carrier to take at a low rate of freight on the assertion and agreement that its value is a less sum than that claimed after a loss. It is just to hold the shipper to his agreement, fairly made, as to value, even where the loss or injury has occurred through the negligence of the carrier.

Practically all of the courts adhering to this doctrine have said that such contracts limiting liability must be just and reasonable and fairly and openly made. See cases cited in 4 Elliott on Railroads, page 2336 *et seq*. The contract here in question, if fairly made, is not so unreasonable in its terms that a court should refuse to enforce it. It is not arbitrary, but gave to the shipper an option which he was at liberty to exercise at his election. But as to whether it was fairly and openly made is a question which will be treated in the next division of this opinion.

II. As bearing upon the proposition of whether or not the contract was fairly and openly made, we find it necessary to set out some more of the record. It seems that before the verdict was directed, plaintiff was put upon the stand and the following record was made: "Mr. Lefebure, had you prior to the time you signed Exhibits 3 and 4, the shipping contracts covering the horses in question—did you have any knowledge from any source of any other or different rate on draft stallions per car load for shipment from New York to Fairfax than $350 per car load? (Defendant objects as being immaterial and irrelevant, because the offer is not made in due time, being made after the submission of the motion for directed verdict, and it is too late, and to allow same would not be in the furtherance of justice.) The Court: The application is over-

3. SAME: admission of evidence.

ruled; the testimony was closed on Saturday the 27th, and a motion for directed verdict was argued at length and submitted, and the ruling to be made was then and there orally announced by the court. It was after that that the offer was made to introduce this additional evidence. (Defendant excepts.) Mr. Redmond: I announced that during the argument, when I was reading the Illinois case to your Honor.'' We think that in furtherance of justice the court should have permitted the introduction of this testimony, and for the purpose of the case we shall treat the question as answered in the negative. The courts are somewhat in conflict regarding what should be considered the making of a contract in such cases. In the *Croninger* case, *supra,* the court said:

That no inquiry was made as to the actual value is not vital to the fairness of the agreement in this case. The receipt which was accepted showed that the charge made was based upon a valuation of $50, unless a greater value should be stated therein. The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the commission. That presumption is strengthened by the fact that across the top of this bill of lading there was this statement in bold type: 'This company's charge is based upon the value of the property, which must be declared by the shipper.'

Again, in *Primrose v. W. U. Tel. Co.,* 154 U. S. 25 (14 Sup. Ct. 1105, 38 L. Ed. 883), the Supreme Court of the United States, said:

In the case at bar, the message, as appeared by the plaintiff's own testimony, was written by him at his office in Philadelphia upon one of a bunch of the defendant's blanks, which he kept there for the purpose. Although he testified that he did not remember to have read the printed matter on the back, he did not venture to say that he had not read it; still less that he had not read the brief and clear notices thereof upon the face of the message, both above the place for writing the message and below his signature. There can be no doubt, therefore, that the terms on the back of the message, so far

as they were not inconsistent with law, formed part of the contract between him and the company under which the message was transmitted.

In most of the cases it seems to be held that the mere acceptance of a bill of lading, in which the terms are clearly

4. SAME: bill of lading: acceptance: when binding.

stated, is sufficient to make a special contract within the meaning of the law, which will be binding upon the parties, according to its terms, provided it is fairly and freely made, is reasonable and not opposed to public policy. *McMillan v. R. R. Co.,* 16 Mich. 79 (93 Am. Dec. 208) ; *M. P. R. R. Co. v. Beeson,* 30 Kan. 298 (2 Pac. 496) ; *Merrill v. Exp. Co.,* 62 N. H. 514; *Boorman v. Exp. Co.,* 21 Wis. 154; *Hill v. R. R. Co.,* 73 N. Y. 351 (29 Am. Rep. 163) ; *Davis v. R. R. Co.,* 66 Vt. 290 (29 Atl. 313, 44 Am. St. Rep. 852) ; *Mulligan v. R. R. Co.,* 36 Iowa, 181. Some cases seem to hold that such an acceptance is *prima facie* evidence of assent to the proposed contract. *Adams Exp. v. Haynes,* 42 Ill. 89; *Southern Exp. Co. v. Moon,* 39 Miss. 822; *King v. Woodbridge,* 34 Vt. 565; *Christenson v. Exp. Co.,* 15 Minn. 270 (Gil. 208, 2 Am. Rep. 122) ; *Strohn v. R. R. Co.,* 21 Wis. 554 (94 Am. Dec. 564). But the weight of authority seems to be that in the absence of fraud, imposition, or the like, it is conclusive. *Grace v. Adams,* 100 Mass. 505 ( 97 Am. Dec. 117, 1 Am. Rep. 131·) ; *Germania Ins. Co. v. R. R. Co.,* 72 N. Y. 90 (28 Am. Rep. 113) ; *Zimmer v. R. R. Co.,* 137 N. Y. 460 (33 N. E. 642) ; *Robinson v. Transp. Co.,* 45 Iowa, 470; *Durgin v. Exp. Co.,* 66 N. H. 277 (20 Atl. 328, 9 L. R. A. 453) ; *R. R. Co. v. Androscoggin Mills,* 22 Wall 594 (22 L. Ed. 724).

Of course, if a shipper without negligence on his part, is misled by the fraud or artifice of the carrier or its agents, or the like, so that the minds of the parties cannot be presumed to have met, the mere acceptance of the bill of lading may not be sufficient to bind the shipper to all its terms. *Perry v. Thompson,* 98 Mass. 249; *Blossom v. Dodd,* 43 N. Y. 264 (3

Am. Rep. 701) ; *Rosenfeld v. R. R. Co.,* 103 Ind. 121 (2 N. E. 344, 53 Am. Rep. 500) ; *Atchison R. R. v. Dill,* 48 Kan. 210 (29 Pac. 148). In some few cases a broader rule has been adopted, and the suggestion made that, as the shipper is at a disadvantage and the carrier may ordinarily impose what terms it will, the carrier, to avoid its common-law liability, must show that the shipper knew the terms of the contract and voluntarily assented thereto. *Little Rock Co. v. Cravens,* 57 Ark. 112 (20 S. W. 803, 18 L. R. A. 527, 38 Am. St. Rep. 230), and cases cited. In this connection it should be stated that in one of the recent cases which went from the Supreme Court of Nebraska to the United States court, to wit, the *Miller* case, *supra,* this question, although in the case, was not referred to in the opinion of the Supreme Court of the United States, doubtless for the reason that under the facts disclosed, it found the contract fairly and freely entered into, although it appears in the record of the case in the Supreme Court of Nebraska that the shipper was not aware of the terms of the contract when he signed it: See *Miller v. R. R. Co.,* 85 Neb. 458 (123 N. W. 449).

Whether or not there was a special contract limiting defendant's liability is, as we understand it, a question of local law, and the opinions of the Supreme Court of the United States upon this issue are not binding upon us. In other words, whether or not there was a contract fairly entered into, without fraud, deceit, or imposition, is a question of local law, not governed by the decisions of other states. *Hoadley v. Trans. Co.,* 115 Mass. 304 (15 Am. Rep. 106) ; *Downer v. Chesebrough,* 36 Conn. 39 (4 Am. Rep. 29) ; *Le Roy v. Beard,* 8 How. 451 (12 L. Ed. 1151). Let us look then to our own decisions upon that question. In *Mulligan v. R. R. Co.,* 36 Iowa, 181, this court said:

5. SAME : fairness of contract : law applicable.

As to the effect of the shipper's ignorance of the terms of the bill of lading by him accepted, from the abstract it appears

that the conditions in this bill of lading were printed upon its face, and the attention of the shipper was called thereto by the direction: *'Read this contract'* printed in italics. There is no evidence of any fraud, imposition, or mistake. A bill of lading, like a deed poll and many other classes of contracts, is signed by one party only, and in such case the evidence of assent upon the part of the other party usually consists in his accepting and acting upon it. And the evidence of assent derived from his acceptance of the contract without objection is usually conclusive. In this case the defendant tendered to the plaintiff a contract containing the stipulations and conditions under which defendant was willing to undertake the trasportation of the goods offered, and challenged an examination of its contents by the first sentence which would have met the plaintiff's eye if he had taken the trouble to look at it. From an acceptance of this paper without protest or objection the defendant had a right to presume that plaintiff assented to its terms. It would therefore operate as a fraud to permit plaintiff now to say: 'I did not read the bill of lading, was not aware of its contents, did not know that you undertook to limit your liability to Cairo, and did not assent that you should do so.' It not appearing that any fraud or imposition was practiced, nor that any mistake intervened, the plaintiff must be conclusively presumed to have become acquainted with its contents; and, if he did not do so, the consequences of his folly and negligence must rest upon himself. Courts cannot undertake to relieve parties from the effects of such inattention and want of care. If once they should enter this doubtful domain, it is impossible to foresee to what lengths their interference might be pressed, or of what limits it would finally admit. These views are abundantly sustained by authority. For a full and masterly discussio1 of the question, see opinion of Cooley, J., in *McMillan et al. v. M. S. & N. I. R. R. Co.,* 16 Mich. 80 (93 Am. Dec. 208), and cases there cited; also *Kallman v. U. S. Ex. Co.,* 3 Kan. 205; *Dorr v. New Jersey Steam Nav. Co.,* 11 N. Y. 491 (62 Am. Dec. 125); *Hopkins v. Westcott et al.,* 7 Amer. Law Reg. (N. S.) 533 (Fed. Cas. No. 6,692). In Illinois it is held, but contrary, as we believe, to the weight of authority, that it is a question of fact whether a party accepting a bill of lading knew of its conditions and assented thereto. *Merchants' Union Ex. Co. v. Joseph Schier,* 55 Ill. 140. In making the

defendant's discharge from liability, under the bill of lading, to depend upon the plaintiff's knowledge of the contents thereof, and in submitting to the jury, under the circumstances of this case, the question of such knowledge, the court, in our opinion, erred. For reasons above stated there was also error in allowing the plaintiff to testify that he did not accept the receipt with a knowledge of the condition contained therein, nor with the intention of assenting that the defendant should not be bound beyond its own line of road.

The same question arose in *Robinson v. Merchants Co.,* 45 Iowa, 472, and we then said: "The plaintiffs further insist that the limitation in the contract as to loss by fire was not known to them at the time of shipment. This was a transaction done in the ordinary and usual course of business. Rawson & Co. undertook to ship goods in question to plaintiffs, at plaintiff's request. Whatever contract of shipment Rawson & Co. made is binding on the plaintiffs, and the plaintiffs cannot avoid it by showing that Rawson & Co. received and forwarded it without examination. In the absence of fraud or mistake the shipper will be conclusively presumed to know the stipulations contained in a contract of affreightment. He cannot be permitted to show that he was ignorant of its contents. *Mulligan v. Ill. Cent. Railway,* 36 Iowa, 181, and cases there cited." See, also, *Wilde v. Trans. Co.,* 47 Iowa, 272.

The only testimony tending to show fraud or imposition we have already quoted, and we do not find enough therein to have justified the court in submitting that issue to the jury. At any rate there was nothing save time, which prevented plaintiff from reading the contract, had he indicated a desire to do so. True the agent was in a hurry, and evidently wished to catch a ferry to get to his home, but there is nothing to indicate that he was trying to impose upon or mislead the plaintiff. Plaintiff himself said there was nothing which prevented his reading the contract, save that it took some time and the agent was in a hurry. However, plaintiff had made many ship-

ments of stock through the defendant company, and had many of their limited liability contracts in his possession. He says, however, that he never read them; but if he did not, it was his own fault. These contracts were all alike, and we are satisfied that he did not familiarize himself with them because of his own negligence. In the absence of fraud or imposition, negligence will not avail him. *Cau v. Tex. Pac. R. R.,* 194 U. S. 427 (24 Sup. Ct. 663, 48 L. Ed. 1053). Nothing to the contrary is found in *Jewelry Co. v. Fessler,* 145 Iowa, 79. In that case there was a substitution of contracts, and by a trick the defendants were induced to sign the one not intended. Nothing of the kind occurred here. It must therefore be held that the limited liability contract was fairly entered into, and that it is valid and binding.

III. We are constrained to hold, however, that the trial court was in error in not awarding plaintiff interest on the $200, at least from the time of the bringing of the suit, and that it also erred in taxing the costs to the plaintiff. This latter order was made because of a tender made by the defendant which plaintiff refused to accept. This tender did not include interest; and, as plaintiff was entitled to interest from the time of the filing of the petition, the amount of his recovery for the $200 being admitted, the trial court should have taxed all the costs to the defendant. In this respect the judgment must be reversed; but in all other respects it will be affirmed. As this latter matter could have been presented in at least fifty pages of printed matter, we shall tax all the costs of this appeal, save the cost of printing of fifty pages of printed matter, to the appellant.

*Affirmed* in part and *Reversed* in part.

6. SAME: damages: interest: lender: taxation of costs.